THE BOARD OF EDUCATION, LEROY COMMUNITY UNIT SCHOOL DISTRICT NO. 2, Petitioner, v. THE ILLINOIS EDUCATIONAL LABOR RELATIONS BOARD *et al.*, Respondents.

Fourth District   No. 4—89—0588

Opinion filed June 28, 1990.

John T. Taylor and Merry C. Rhoades, both of Robbins, Schwartz, Nicholas, Lifton & Taylor, Ltd., of Decatur, for petitioner.

Neil F. Hartigan, Attorney General, of Springfield (Robert J. Ruiz, Solicitor General, and William D. Frazier and Rosalyn B. Kaplan, Assistant Attorneys General, of Chicago, of counsel), for respondent Illinois Educational Labor Relations Board.

Sandra Holman, of Illinois Education Association, of Springfield, and Christopher T. Hexter, of Schuchat, Cook & Werner, of St. Louis, Missouri, for respondent LeRoy Education Association.

JUSTICE McCULLOUGH delivered the opinion of the court:

In an effort to improve the quality of education in the State, the legislature amended the School Code providing for evaluations of elementary and secondary public school teachers. (Ill. Rev. Stat. 1987, ch. 122, par. 24A—1 *et seq.*) The amendment also provided for a remediation plan. (Ill. Rev. Stat. 1987, ch. 122, par. 24A—5.) The primary question posed by this appeal is to what extent the evaluation plans are subjects of mandatory collective bargaining. Ill. Rev. Stat. 1987, ch. 48, par. 1701 *et seq.*

The Board of Education of LeRoy Community School District No. 2 (District) appeals a finding that it committed an unfair labor practice by failing to bargain over a teacher evaluation plan. The Illinois Educational Labor Relations Board (IELRB) found the District had violated sections 14(a)(5) and (a)(1) of the Illinois Educational Labor Relations Act (Act) (Ill. Rev. Stat. 1985, ch. 48, pars. 1714(a)(5), (a)(1)) by failing to bargain over the content of a teacher evaluation plan. *LeRoy Community Unit School District 2*, 5 Pub. Employee Rep. (Ill.) par. 1131, No. 88—CA—0031—S (Illinois Educational Labor Relations Board, June 23, 1989).

The District argues the IELRB erred in determining (1) teacher evaluation plans are a mandatory subject of collective bargaining; (2) the LeRoy Education Association (LEA) had not waived further negotiation of teacher evaluation plans by including the topic in the collective-bargaining agreement; (3) the zipper clause did not preclude midterm bargaining over the issue; and (4) the LEA made a formal demand to bargain.

We affirm in part, reverse in part, and remand.

The IELRB filed a cross-petition for enforcement of its order. On January 8, 1990, this court ordered the cross-petition taken with the case and instructed the parties to further brief the issue. For reasons which we will discuss fully later in this disposition, we deny the cross-petition.

## I. FACTUAL BACKGROUND

The facts will be recounted only as necessary for an understanding of the disposition.

## A. JUNE 1, 1988, HEARING

### (1) PRELIMINARY MATTERS

The LEA represents the LeRoy Community Unit School District No. 2 certified personnel. It had entered two collective-bargaining agreements with the District. The 1985 through 1987 agreement expired on June 30, 1988. The 1987 through 1989 agreement started on July 1, 1989. The 1985 through 1987 agreement contained a provision dealing with employee evaluations.

### (2) DISCUSSIONS LEADING TO DEVELOPMENT OF A TEACHER EVALUATION PLAN

Florence Heavilin, a teacher for the District, testified the LEA formed a committee to negotiate teacher evaluation plans in direct response to the amendment to the School Code. She was spokesperson for the LEA committee. Sharon Tuchek, Shirley Chancellor, Jenilee Thompson, and Patricia Schultz were committee members. On May 29, 1986, the LEA sent a formal request to bargain the "decisions and effects" of teacher evaluation plans in light of the amendment to the School Code. In September 1986, Heavilin spoke to Crump about joint meetings to discuss proposed evaluation plans. On September 15, 1987, the LEA received the District's first proposed plan. Heavilin testified Crump directed the LEA to return a counterproposal at the October 1986 school board meeting. Heavilin attended the meeting and received an extension of time.

Kenneth Erickson, a school board member, stated he and Heavilin had a one-to-one discussion at the October 6, 1986, meeting. He told Heavilin the Board of Education did not consider the discussions about teacher evaluation plans to be negotiations, negotiations would have to occur at the bargaining table, and all the school board wanted was "input" from the teachers. Erickson did not remember whether Heavilin told him the LEA had received the District's proposal. The District had given the LEA a proposal but only wanted its "input" not a counterproposal at the October 6, 1986, meeting. The "input" would consist of a written statement from the LEA which would be considered by the District's teacher evaluation committee.

Heavilin testified no one on her committee had ever been told the meetings were for input only. They were not told the meetings were not considered negotiations.

The September 1986 plan submitted by the District contained a definition-of-terms section; job descriptions for the teachers, librarians, counselors, and the dean of students; performance criteria; a rat-

ing system; and a remediation plan that paralleled the School Code. In December 1986, the LEA presented its plan. The LEA's counterproposal added sections on the philosophy and purpose of evaluations, and general information about the process. Additionally, the LEA proposal changed some of the job descriptions, changed performance criteria, and adjusted the rating system. It also included a more detailed remediation plan. The LEA counterproposal required reasons for stated strengths and weaknesses, dropped the rating "below average," and stated how the rating of superior should be determined.

In March 1987, the District's committee gave the LEA committee a second evaluation proposal. The two committees set up a joint meeting schedule. The District's second proposal did not add all the sections the LEA wanted added. However, the definition-of-terms section was modified, "below average" was deleted, and the rating system was changed. This was consistent with the LEA counterproposal. The proposal also deleted the remediation plan and eliminated the examples in the job description categories. The District's teacher evaluation committee consisted of: Superintendent Crump, Gary Golden, Jean Strum, Jim Dunnan, and Mike Company.

On April 1, 1987, the LEA and District committees held their first joint session. At the meeting, Golden handed out a memorandum, which stated the purpose of the meetings and noted the parties could collectively define district standards. Golden, a member of the Board of Education and chairman of the District's evaluation committee, stated he told the committee members at each meeting that the discussions were only advisory. Heavilin testified she could not recall Golden ever saying the meetings were advisory only.

On April 9, 1987, the committees held their first substantive discussion. They discussed the differences and noted similarities in the District's second proposal and the LEA's counterproposal. They reached a full agreement about the definition-of-terms section. Golden initialed those pages on the LEA counterproposal with which he agreed. The next full meeting took place on May 14, 1987. The committees discussed items not previously discussed in connection with teacher evaluations and "hashed out" disagreements. On May 26, 1987, both committees met for the third time. The committees attempted to complete discussion of outstanding issues, which included the rating system and remediation plan. The next full meeting occurred on June 4, 1987. The committees again discussed the rating system. The LEA committee tried to discuss the remediation plan. The District's committee said it would follow the School Code. Heavilin asked the District to have Brian Braun, its attorney, review the

LEA remediation proposal. The District's committee indicated it would have Braun review the LEA's plan. On June 4, 1987, the District's committee members stated it would present the plan as it had taken shape to the school board at the June meeting. The LEA committee members stated the plan was not complete. The plan was not presented to the Board of Education at its June meeting.

A fifth full meeting of both committees occurred on July 14, 1987. The committees discussed incomplete items. The LEA committee asked about Braun's comments on its remediation plan. The District's committee stated it had not received a response from Braun. Heavilin testified that after the committees started working July 14, 1987, Golden stated the District's committee was finished. Crump stated the District would have an evaluation plan for the LEA committee to review on July 20, 1987. Crump stated he wanted the LEA committee to check the plan before he sent it to the District's attorney. The LEA committee members requested further negotiations.

On July 27, 1987, Crump gave Heavilin a draft proposal which was essentially the composite proposal which both committees had agreed to on April 9, 1987.

On September 1, 1987, the LEA committee received a revised evaluation plan with comments from Braun. A joint meeting was scheduled for September 10, 1987, to discuss the revisions. The September 1, 1987, plan changed the definition-of-terms section, which had been previously agreed upon. It added back the "below average" rating, which the committees had deleted on April 9, 1987. The revised plan also included evaluating teachers based upon extracurricular activities, which had not been the subject of evaluation prior to September 1, 1987. The position of dean of students was eliminated from the evaluation procedure. Also, while ratings were tied to "direct observation" prior to the September 1, 1987, revision, the word "direct" was deleted from the September 1, 1987, evaluation plan. The plan also included a "does not meet district standards" category. No district standards were specified. The remediation plan had been changed back to a reference to the plan contained in the School Code.

On September 11, 1987, Crump sent a second revised evaluation plan to members of the District and LEA's committees. The second revised plan stated who was covered by it; how evaluations would occur; when they would occur; gave performance ratings, which included "below average"; stated remediation plans would comply with the School Code; and changed the ratings to narrative only. Heavilin testified that plan added items which had never been discussed and changed the rating system.

Heavilin stated that after the LEA committee received the September 11, 1987, revised plan, the LEA committee told Crump it did not support presentation of the plan to the Board of Education. On September 14, 1987, the LEA committee sent a protest in a letter to Crump. At the September 14, 1987, Board of Education meeting, the board formally adopted the September 11, 1987, revised plan.

## B. NEGOTIATIONS FOR TEACHER EVALUATION PLANS IN THE 1987 THROUGH 1989 COLLECTIVE-BARGAINING AGREEMENT

Heavilin agreed that the 1987 through 1989 contract contained a provision on employee evaluations. The contract provisions did not cover the areas set out in the School Code. Heavilin's committee began negotiations prior to the contract negotiations. She was never told discussion of the evaluation plan was limited by the collective-bargaining agreement talks.

While the evaluation committees were meeting, negotiations for the 1987 through 1989 collective-bargaining agreement began. The LEA's bargaining team consisted of Larry Heavilin, Jenilee Thompson, Steve Epperson, and Peggy Hartwig. The District's negotiating team consisted of Greg Bane, Kenneth Erickson, Keith Morgan, and Crump. Larry Heavilin is Florence Heavilin's husband.

Larry Heavilin testified the LEA presented a contract proposal to the District on April 10, 1987. The proposal included a provision on employee evaluations. Larry Heavilin knew that separate discussions were ongoing between the LEA and District to develop an evaluation plan. The LEA wanted the plan developed by the evaluation committees to be incorporated into the contract. Article V in the first proposal provided for incorporation.

At the parties' first contract negotiation session on June 1, 1987, the negotiators tabled discussion of proposed article V. Subsequently, the District rejected proposed article V and offered to reincorporate the language from the prior contract. The LEA rejected the counterproposal. Bane and Erickson testified both sides discussed the LEA proposal prior to the District's rejection of it. Bane also testified the LEA insisted on incorporation at every meeting. The District repeatedly rejected the idea. Larry Heavilin admitted a District negotiator said all the District had to do was gather "information" from the teachers about an evaluation plan. Subsequently, the parties agreed to include a modification of the 1985 through 1987 contract language.

The District's negotiator, Erickson, stated he did not believe the 1987 through 1989 contract provision regarding evaluations complied with section 24A—1 of the School Code. Similarly, Larry Heavilin tes-

tified he knew when the LEA signed the 1987 through 1989 contract that section 5 did not comply with the School Code. However, he knew the evaluation plan committees were still working.

## II. ANALYSIS

### A. MANDATORY BARGAINING OF TEACHER EVALUATION PLANS

Initially, we address the District's contention that little deference should be given the IELRB's determination because it was interpreting section 24A—1 of the School Code rather than section 10 of the Act. (Ill. Rev. Stat. 1987, ch. 122, pars. 24A—1 through 24A—8; Ill. Rev. Stat. 1987, ch. 48, par. 1710.) In a related fashion, the District argues section 24A—1 of the School Code and other sections preclude bargaining over teacher evaluation plans.

■ The duty to bargain collectively stems from the Act. (Ill. Rev. Stat. 1987, ch. 48, par. 1710.) However, that duty is not all encompassing. (See Ill. Rev. Stat. 1987, ch. 48, par. 1704.) Additionally, a collective-bargaining agreement may not limit any employee rights conferred by statute. (Ill. Rev. Stat. 1987, ch. 48, par. 1710(b).) Some duties may be nondelegable. (See generally *Board of Governors of State Colleges & Universities v. Illinois Educational Labor Relations Board* (1988), 170 Ill. App. 3d 463, 480-81, 524 N.E.2d 758, 768.) The legislature could specifically exempt teacher evaluation plans from the bargaining statute. See, *e.g.*, *Wethersfield Board of Education v. Connecticut State Board of Labor Relations* (1986), 201 Conn. 685, 519 A.2d 41.

Thus, we must first determine whether the language of the School Code indicates the legislature exempted teacher evaluation plans from collective bargaining. Section 10—20.7 of the School Code states the school board is authorized "[t]o appoint all teachers and fix the amount of their salaries." (Ill. Rev. Stat. 1987, ch. 122, par. 10—20.7.) Section 10—21.1 of the School Code states the school board is authorized "[t]o examine teachers by examinations supplemental to any other examinations and to employ teachers and fix the amount of their salaries subject to limitations set forth in this Act." (Ill. Rev. Stat. 1987, ch. 122, par. 10—21.1.) Section 10—22.4 provides the board may dismiss a teacher who fails to complete a one-year remediation plan with a satisfactory or better rating. Ill. Rev. Stat. 1987, ch. 122, par. 10—22.4.

In 1985, the General Assembly amended the School Code by adding Article 24A. (See Ill. Rev. Stat. 1987, ch. 122, pars. 24A—1 through 24A—8.) The stated purpose of the article is to improve edu-

cational services in elementary and secondary schools by requiring periodic evaluation of all certified employees. (Ill. Rev. Stat. 1987, ch. 122, par. 24A—1.) Section 24A—4 of the School Code states:

> "*Each school district shall develop, in cooperation with its teachers or, where applicable, the exclusive bargaining representatives of its teachers, an evaluation plan for all teachers in contractual continued service.* The district shall, no later than October 1, 1986, submit a copy of its evaluation plan to the State Board of Education \*\*\*." (Emphasis added.) (Ill. Rev. Stat. 1987, ch. 122, par. 24A—4.)

Section 24A—8 provides nontenured teachers shall be evaluated once each school year. (Ill. Rev. Stat. 1987, ch. 122, par. 24A—8.) Section 24A—5 states in part:

> "Content of evaluation plans. Each school district to which this Article applies shall establish a teacher evaluation plan which ensures that each teacher in contractual continued service is evaluated *at least once* in the course of every 2 school years, beginning with the 1986-87 school year.
>
> The evaluation plan shall comply with the requirements of this Section and of any rules adopted by the State Board of Education pursuant to this Section.
>
> The plan shall include a description of each teacher's duties and responsibilities and of the standards to which that teacher is expected to conform.
>
> \* \* \*
>
> *In districts subject to a collective bargaining agreement as of August 1, 1985, the provisions of this Section shall go into effect only upon expiration of that agreement. Thereafter, collectively bargained evaluation plans shall at a minimum meet the standards of this Article. If such a district has an evaluation plan, however, whether pursuant to the collective bargaining agreement or otherwise, a copy of that plan shall be submitted to the State Board of Education for review and comment, in accordance with Section 24A—4.*" (Emphasis added.) Ill. Rev. Stat. 1987, ch. 122, par. 24A—5.

■ The primary rule of statutory construction is to interpret the statutes in a manner which effectuates the legislature's intent in enacting the statute. (*City of Decatur v. American Federation of State, County, & Municipal Employees, Local 268* (1988), 122 Ill. 2d 353, 522 N.E.2d 1219.) The language of the statute should be given its ordinary meaning. (*Trigg v. Sanders* (1987), 162 Ill. App. 3d 719, 515 N.E.2d 1367.) The statute should be interpreted so that no word or

phrase is rendered superfluous. *People v. Singleton* (1984), 103 Ill. 2d 339, 469 N.E.2d 200.

The District argues section 24A—4 of the School Code states it must develop plans "in cooperation with" the LEA. Since the legislature did not direct the development of a plan "through negotiation" with the teacher association, the District argues requiring bargaining is erroneous.

■ The language of section 24A—4 of the School Code is directed to school districts where a bargaining unit exists and to those where no bargaining unit exists. The District is directed to "cooperate" with the teachers or, where applicable, their exclusive bargaining representatives. "Cooperate" is defined as acting or working jointly with another toward a common goal. (Webster's Third New International Dictionary 501 (1961).) "Negotiate" is defined as "to communicate or confer with another so as to arrive at the settlement of some matter." (Webster's Third New International Dictionary 1514 (1961).) Thus, the use of the word "cooperate" does not mandate negotiation. The "in cooperation with" language encourages dialogue between the certified employees and school districts. It does not mandate or preclude negotiation. (See, *e.g., Bethlehem Township Board of Education v. Bethlehem Township Education Association* (1982), 91 N.J. 38, 449 A.2d 1254.) Since the statute applies to school districts with a collective-bargaining organization and to those without one, the language encourages discussion in both situations. However, in context it does not imply or directly state negotiations are forbidden by the statute.

We note that House Bill 2387 was introduced on April 12, 1985. Section 24A—4 originally stated:

"Each school district shall develop, in cooperation with its teachers, an evaluation plan ***." (84th Ill. Gen. Assem., House Bill 2387, 1985 Sess., at 6.)

Section 24A—5 provided in part:

"In districts subject to a collective bargaining agreement as of the effective date of this amendatory Act of 1985, the provisions of this Section shall go into effect only upon expiration of that agreement. If such a district has an evaluation plan, however, whether pursuant to the collective bargaining agreement or otherwise, a copy of that plan shall be submitted to the State Board of Education for review and comment, in accordance with Section 24A—4." 84th Ill. Gen. Assem., House Bill 2387, 1985 Sess., at 9.

Senate amendment No. 2 added the language in section 24A—4 which required the districts to develop plans in cooperation with the

exclusive bargaining representative, where applicable. (See III Final Legislative Synopsis and Digest of 1985 Session of the 84th Gen. Assem., House Bill 2387 (June 18, 1985), at 1949.) The following language was also added: "Thereafter, collectively bargained evaluation plans shall at a minimum meet the standards of this Article," to section 25A–5 of the School Code. On June 30, 1985, the amended bill returned to the House of Representatives. Although the legislative history of the bill after its return to the House is not clear, a dispute existed as to whether the amendment envisioned collectively bargained evaluation plans. (84th Ill. Gen. Assem., House Proceedings, June 30, 1985, at 69-70 (debate on House Bill 2387).) However, the House concurred in the bill as amended. (III Final Legislative Synopsis and Digest of 1985 Session of the 84th Gen. Assem., House Bill 2387 (June 30, 1985), at 1950.) Thus, it appears the legislature was aware when House Bill 2387 was passed that it permitted collective bargaining of evaluation plans.

██ However, this does not determine which parts, if any, of the evaluation plans are subject to mandatory bargaining. Whether plans are subject to mandatory bargaining should be determined in light of the Act. The mere existence of laws dealing with issues which are bargainable does not preclude or negate or make mandatory the duty to bargain. *City of Decatur*, 122 Ill. 2d 353, 522 N.E.2d 1219.

Section 4 of the Act states:

"Employer rights. Employers shall not be required to bargain over matters of inherent managerial policy, which shall include such areas of discretion or policy as the functions of the employer, standards of services, its overall budget, the organizational structure and selection of new employees and direction of employees. Employers, however, shall be required to bargain collectively with regard to policy matters directly affecting wages, hours and terms and conditions of employment as well as the impact thereon upon request by employee representatives." Ill. Rev. Stat. 1987, ch. 48, par. 1704.

The District argues both the substantive criteria for employee evaluations and the procedures utilized in evaluating employees are matters of inherent managerial policy. Thus, the District maintains employee evaluations are not subjects of mandatory bargaining. The LEA argues this court should afford deference to the IELRB's determination that evaluation plans are a mandatory subject of bargaining and relies upon *Community Consolidated School District No. 59*, 3 Pub. Employee Rep. (Ill.) par. 1094, No. 86–CA–0012–C (Illinois Educational Labor Relations Board, July 23, 1987). The IELRB argues

deference should be given to its determination that evaluation issues are subjects of mandatory bargaining. The IELRB acknowledges that *Community Consolidated School District* was decided prior to implementation of the "balancing test" to determine mandatory bargaining topics, but it urges this court to apply the balancing test and find evaluation plans are a subject of mandatory bargaining.

■ An IELRB determination pertaining to mandatory bargaining subjects should be afforded considerable deference. (*Decatur Board of Education, District No. 61 v. Illinois Educational Labor Relations Board* (1989), 180 Ill. App. 3d 770, 536 N.E.2d 743; see generally *American Federation of State, County & Municipal Employees, AFL-CIO v. Illinois State Labor Relations Board* (1989), 190 Ill. App. 3d 259, 546 N.E.2d 687.) However, an administrative agency's interpretation of the law is not binding on the courts. It will be rejected where it is erroneous. *City of Decatur*, 122 Ill. 2d 353, 522 N.E.2d 1219.

In *Decatur Board of Education*, this court affirmed the IELRB's adoption of a balancing test to determine whether class size was a mandatory subject of bargaining. First, the agency must determine whether the action has a direct impact on the wages, hours, or terms and conditions of employment, but also involves inherent managerial policy. If an overlap exists, the agency must balance the employee's right to bargain with the policy of protecting inherent managerial rights. The agency then determines whose interests are more at risk. *Decatur Board of Education*, 180 Ill. App. 3d at 775-77, 536 N.E.2d at 746-48; see also *American Federation of State, County, & Municipal Employees*, 190 Ill. App. 3d at 267-68, 546 N.E.2d at 693.

■ Thus, a mandatory bargaining determination involves a mixed question of fact and law. First, the agency determines the factual question of whether the challenged action involves a policy decision which has a direct or indirect impact on wages, hours, or terms and conditions of employment. If the management policy has a direct effect on the work force, the agency must balance the interests of management with the interests of the work force. Its determination of whose interests are more at risk is a question of law.

We note that in *Community Consolidated School District*, the IELRB held school districts had a duty to bargain collectively over the development and implementation of teacher evaluation plans mandated by section 24A—1 of the School Code. The IELRB rejected the school district's argument that evaluations involved inherent managerial rights and rejected an argument that the language of sections 24A—4 and 24A—5 of the School Code did not require bargaining. In *Mattoon Community School District No. 2*, 5 Pub. Employee Rep.

(Ill.) par. 1199, No. 87—CA—0014—S (Illinois Educational Labor Relations Board, Nov. 14, 1988), the IELRB noted it had adopted a balancing test after the decision in *Community Consolidated School District*. However, assuming evaluations affected "standards of services," the IELRB found that the impact of the evaluation plans on the employees is substantially more direct than the impact of bargaining evaluation plans on the overall standards of service.

Under the balancing test affirmed by this court in *Decatur Board of Education*, this court must first consider whether the IELRB's determination that evaluation plans affect wages, hours, and terms and conditions of employment is supported by the manifest weight of the evidence. (See generally *Board of Regents v. Illinois Educational Labor Relations Board* (4th Dist. April 5, 1990), Nos. 4—89—0187, 4—89—0188, 4—89—0202 cons.) The instant plan includes job descriptions, performance goals, how a teacher should plan lessons; rates a teacher's actions with students, the professionalism of the teacher, classroom management, deportment, appearance, health, ability to teach; and evaluates the handling of extracurricular activities. By statute, an unfavorable evaluation may be used to dismiss a tenured teacher for incompetency. (Ill. Rev. Stat. 1987, ch. 122, par. 10—22.4.) In the instant case, the District's former attorney, Braun, noted the District should not tie itself down to specific reasons for ratings because the ratings might be used later as a basis for disciplinary action. Thus, it is apparent that the evaluation plan in the instant case will affect the teachers' day-to-day activities. They could easily determine the work environment.

■ However, the purpose of evaluations is to assess the "quality" of teacher performance. We find that insuring the quality of teaching in a school district involves policy determinations and the overall direction of employees. (Ill. Rev. Stat. 1987, ch. 48, par. 1704.) A negotiated agreement on the criteria utilized in assessing quality of an instructor's performance could significantly interfere with the State's policy of ensuring quality education. (See, *e.g.*, *Bethlehem*, 91 N.J. 38, 449 A.2d 1254; Ill. Rev. Stat. 1987, ch. 122, par. 24A—1 *et seq.*) Thus, a determination that teacher evaluation plans involve policy which may directly impact the work force is supported by the manifest weight of the evidence.

Several jurisdictions, in assessing the relative impact of evaluation plans on the day-to-day activities of the teachers, have found that the substantive criteria and the procedures involved in teacher evaluation plans are subjects of mandatory bargaining. (See, *e.g.*, *Northeast Community School District v. Public Employment Relations Board*

(Iowa 1987), 408 N.W.2d 46; *Aplington Community School District v. Iowa Public Employment Relations Board* (Iowa 1986), 392 N.W.2d 495; *Evansville-Vanderburgh School Corp. v. Roberts* (Ind. 1980), 405 N.E.2d 895, 898-99; *Central Michigan University Faculty Association v. Central Michigan University* (1978), 404 Mich. 268, 273 N.W.2d 21; *Board of School Trustees of Gary Community School Corp. v. Indiana Education Employment Relations Board* (Ind. Ct. App. 1989), 543 N.E.2d 662.) Other jurisdictions have held that substantive criteria, weight, and review of teacher evaluations are matters of inherent managerial rights. (See, *e.g., Board of Education, U.S.D. No. 352 v. NEA-Goodland* (1990), 246 Kan. 137, 785 P.2d 993; *University Education Association v. Regents of University of Minnesota* (Minn. 1984), 353 N.W.2d 534; *Bethlehem Township Board of Education*, 91 N.J. 38, 449 A.2d 1254; *East County Bargaining Council v. Centennial School Dist. No. 28JT* (1984), 69 Or. App. 47, 685 P.2d 452.) One court noted that the quality of work which an employer, either public or private, expects is always a managerial decision. (*University Education Association*, 353 N.W.2d at 542.) These jurisdictions, under their bargaining acts, hold the substantive criteria for employee evaluations were not a subject of mandatory bargaining. The procedure involved in the evaluation process is held to be a subject of mandatory bargaining.

Since both inherent managerial policy and terms and conditions of employment are affected by the teacher evaluation plans, the IELRB balanced the two to determine which is affected in a greater fashion. In the instant case, the IELRB relied on its prior decisions in determining the teachers' terms and conditions of employment were more severely affected by the evaluation plans than was managerial policy. The District argues in essence the IELRB erred in relying on its past decisions. Since neither *Community Consolidated School District* nor *Mattoon* had been ruled on by a reviewing court considering this issue, the agency properly relied on its decisions as precedent. While we acknowledge the IELRB's determination is entitled to substantial deference from this court, we believe the better reasoned approach is that which safeguards the school board's statutory duty to control the quality of employee performance, while preserving the teachers' right to bargain the procedure used to make the evaluation determination.

Article 24A of the School Code is designed to promote professional excellence. It is also designed to establish a statewide minimum-competency level. It ensures that local boards of education have the means to control the quality of teaching in their district and requires improvement plans. It provided a means to evaluate tenured

teachers. We note the evaluation plans must meet the minimum standards set forth in the School Code and be reviewed by the Illinois Department of Education. Therefore, we find the criteria, including who conducts the evaluation, upon which an instructor is evaluated are not subject to mandatory bargaining.

■■ However, appraisal procedures which involve the mechanics of evaluations are subjects of mandatory negotiation. The mechanical aspects of the evaluation process affect the instructors' day-to-day activities. Collective-bargaining agreements concerning matters such as the timing of evaluations and appropriate remediation procedures would not involve the inherent managerial policy of a school district. We note article 24A sets forth the minimum content of remediation plans. It also does not foreclose collectively bargained remediation procedures which exceed the minimum plan.

Therefore, we reverse the IELRB's determination that the substantive criteria, weight, and areas evaluated are subject to mandatory bargaining. However, we agree the mechanical procedures involved in the evaluation process and the remediation plan are subject to mandatory bargaining. The decision as to whether an instructor has successfully completed a remediation plan and his subsequent rating is not bargainable.

### B. TIMELINESS OF THE COMPLAINT

Section 15 of the Act provides in part: "No order shall be issued upon an unfair practice occurring more than six months before the filing of the charge alleging the unfair labor practice." (Ill. Rev. Stat. 1987, ch. 48, par. 1715.) The LEA filed its first unfair labor practice charge in the instant case on December 17, 1987. The LEA withdrew the December 17, 1987, charge because the District had entered an oral stipulation that it would settle by negotiating the issue further. However, on January 20, 1988, the LEA learned the negotiated settlement had collapsed. It filed the instant unfair labor practice charge on January 28, 1988. The January 28, 1988, charge alleged the District committed an unfair labor practice by unilaterally adopting a teacher evaluation plan without bargaining.

The IELRB found the six-month period began to run on September 14, 1987, the day the Board of Education adopted the teacher evaluation plan. The District argues the LEA "knew or had reason to know" of the unfair labor practice on April 1, 1987, between April 10, 1987, and June 30, 1987 (the period during which the collective-bargaining agreement was negotiated), or at least by July 14, 1987, when the District's evaluation committee chairperson said the District's

committee had finished working on the evaluation plan.

■■ The charge in the instant case was filed in a timely fashion. In *Wapella Education Association, IEA-NEA v. Illinois Educational Labor Relations Board* (1988), 177 Ill. App. 3d 153, 531 N.E.2d 1371, this court held the limitation period starts when the charging party is aware or should have been aware of a unilateral change in policy. This is usually the day when the change in policy is "unambiguously announced," not the day it is implemented. In *Wapella*, the court held this date was the day the school board voted to rescind its policy of giving teachers full credit for service in other districts. See also *Chicago Board of Education*, 2 Pub. Employee Rep. (Ill.) par. 1089, No. 84—CA—0087—C, (Illinois Educational Labor Relations Board, June 24, 1986), *aff'd in pertinent part, rev'd in other part sub nom. Board of Education v. Illinois Educational Labor Relations Board* (1988), 170 Ill. App. 3d 490, 524 N.E.2d 711.

The District characterizes the unfair labor practice as *its* decision not to bargain. It argues the LEA was aware of the decision from April 1, 1987, on. However, absent action by the Board of Education on the decision, the unfair labor practice action alleged here could not be brought. The unfair labor practice alleged here is the adoption of a unilateral change in policy. Additionally, under *Wapella*, the District did not "unambiguously announce" the policy change until September 14, 1987. Although members of the District stated they only wanted information from the teachers, the District's evaluation committee engaged in negotiation-type behavior with the LEA committee until early September. Thus, the IELRB's determination that the LEA did not have notice of a unilateral change in policy until September 14, 1987, is supported by the manifest weight of the evidence.

## C. WAIVER BY NEGOTIATION

The District argues, without citation to any authority, that it bargained the subject of teacher evaluation plans with the LEA, both parties entered a collective-bargaining agreement, which contained a provision on the subject area and, thus, the LEA waived its right to further bargain teacher evaluation plans.

■■ A bargaining obligation may still exist once a collective-bargaining agreement is executed. However, when parties have fully bargained a mandatory subject of bargaining or have reached an agreement, which is incorporated into the collective-bargaining agreement, the parties may waive further bargaining. (*East Richland Unit School District No. 1*, 3 Pub. Employee Rep. (Ill.) par. 1055, No. 86—CA—0005—S (Illinois Educational Labor Relations Board May 14, 1987), at

VII—154, *aff'd sub nom. East Richland Education Association, IEA-NEA v. Illinois Educational Labor Relations Board* (1988), 173 Ill. App. 3d 878, 528 N.E.2d 751; *Rock Falls Elementary School District No. 13*, 2 Pub. Employee Rep. (Ill.) par. 1150, No. 85—CA—0052—C (Illinois Educational Labor Relations Board, Nov. 12, 1986).) A midterm bargaining obligation may continue for items which are not fully bargained nor set forth in the agreement.

Here, the LEA, during negotiations for the new collective-bargaining agreement, proposed incorporating the result of the LEA and District's evaluation plan committees. The District's contract negotiators rejected this proposal and proposed leaving the old contract language in the new collective-bargaining agreement. The LEA rejected the old contract language. The parties compromised on some procedural statements. However, Larry Heavilin (LEA) and Erickson (District negotiator) stated they knew the collective-bargaining agreement clause did not comply with section 24A—1 of the School Code. The District's negotiators would not discuss details of evaluation plans with the LEA's contract negotiators. Both sides knew simultaneous evaluation plan committee meetings were being held. The evaluation committees were still meeting at the time the contract was executed.

Under the facts presented here, the IELRB's conclusion that the parties had not fully bargained the teacher evaluation plan is supported by the manifest weight of the evidence. Therefore, the LEA did not waive midterm bargaining by agreeing to the collective-bargaining agreement. See also *Chicago Board of Education, District 299*, 5 Pub. Employee Rep. (Ill.) par. 1092, No. 86—CA—0098—C (Illinois Educational Labor Relations Board, May 2, 1989), at IX—288 (where parties were engaged in simultaneous negotiation of an examination for employees outside of the contract negotiations, a zipper clause did not preclude midterm bargaining).

### D. THE "ZIPPER CLAUSE"

Article X, section 10.1, of the 1987 through 1989 collective-bargaining agreement states:

> "The terms and conditions set forth in this agreement represent the full and complete understanding between the Board of Education of LeRoy Unit District No. 2 and the LeRoy Education Association. Alterations, changes, additions, deletions or modifications to this agreement may occur only with mutual consent of both parties. The association agrees that all negotiable items have been discussed during the bargaining leading to this agreement and agrees that negotiations will not be reo-

pened on the effect of any item contained in this agreement during the life of this agreement."

The IELRB found the "zipper clause" did not preclude bargaining over the teacher evaluation plans. It noted the language could be read as precluding bargaining over evaluations since article V of the agreement addressed evaluations. However, it also considered the bargaining history and concluded the LEA did not waive bargaining by entering a collective-bargaining agreement. The District argues the IELRB's decision is contrary to the manifest weight of the evidence. It contends the LEA knowingly and intelligently waived bargaining over teacher evaluation plans.

■■■ Contractual waiver may be established by express contract language or by extrinsic evidence establishing the parties did not use the contractual words in their usual sense. An agreement to waive midterm bargaining must be clear and unmistakable. (*East Richland Education Association*, 173 Ill. App. 3d 878, 528 N.E.2d 751; see also *American Federation of State, County & Municipal Employees*, 190 Ill. App. 3d 259, 546 N.E.2d 687 (interpreting the effect of a zipper clause under the Illinois Public Labor Relations Act).) Thus, for a contractual waiver to be found, the language of the agreement in light of any evidence presented on bargaining history must present "a clear and unmistakable" agreement to waive midterm bargaining.

■■■ Here, the language of article X could be viewed as precluding further bargaining on evaluation plans. The LEA agreed "that negotiations will not be reopened on the effect of any item contained in this agreement." Article V of the agreement addressed some evaluation plan procedures. However, when one considers the bargaining history, the IELRB's conclusion that the District had not shown a "clear and unmistakable" waiver is supported by the evidence.

The District argues it was not "negotiating" with teachers, because it told them that the evaluation committee meetings did not constitute negotiation. While we agree that a party may meet and discuss items without negotiating them, a party's characterization of its conduct is not controlling. The District's conduct in the evaluation committees contained all the "give and take" of negotiation. See *Chicago Board of Education*, 5 Pub. Employee Rep. (Ill.) par. 1092, at IX–225.

### E. THE DEMAND TO BARGAIN

■■■ On May 29, 1986, the LEA sent the District a letter requesting bargaining over the decisions, effects, and impact of teacher evaluation plans which were to be formulated in compliance with article

24A—1 of the School Code. In September 1986, Florence Heavilin spoke to Crump. Thereafter, the sequence of meetings began which culminated in the September 14, 1987, adoption of an evaluation plan. The District now argues that the negotiations which occurred for the 1987 through 1989 contract satisfied the May 29, 1986, bargaining demand. The District asserts the LEA never made a formal demand to bargain implementation of the teacher evaluation plan which was adopted September 14, 1987; therefore, it cannot be found to have committed any unfair labor practice.

The District's argument is premised upon acceptance of its implicit assertion that the teacher evaluation plans were "fully bargained" during the collective-bargaining process. However, the District refused throughout the collective-bargaining agreement negotiations to discuss the substance or impact of teacher evaluation plans or remediation procedures. It did discuss some procedural matters, but even these procedures may not have satisfied the minimum requirements of the School Code. All parties acknowledge the collective-bargaining agreement provision on teacher evaluations is not sufficient under the School Code.

The IELRB's finding that the May 29, 1986, bargaining demand was viable is supported by the manifest weight of the evidence.

### III. CROSS-PETITION FOR ENFORCEMENT: APPELLATE JURISDICTION

Effective August 30, 1989, Public Act 86—412 became law. (Pub. Act 86—412, eff. Aug. 30, 1989.) (1989 Ill. Legis. Serv. 2351 (West).) It modified section 16(c) of the Act (Ill. Rev. Stat. 1987, ch. 48, par. 1716(c)) so that it now provides that petitions for enforcement of IELRB orders may be made directly to the appellate court rather than to the circuit court. The provisions state, as amended:

"(b) Whenever it appears that any person has violated a final order of the Board issued under this Act, the Board may commence an action in the name of the people of the State of Illinois by petition, alleging the violation, attaching a copy of the order of the Board, and praying for the issuance of an order directing the person, his officers, agents, servants, successors, and assigns to comply with the order of the Board. Upon the commencement of the action, the Court may grant or refuse, in whole or in part, the relief sought, provided that the Court may stay an order of the Board in accordance with Section 3—111 of the Code of Civil Procedure pending disposition of the proceedings. The Court may punish a violation of its order as in civil contempt.

(c) The proceedings provided in subsection (b) of this Section shall be commenced in the Appellate Court of a judicial district in which the Board maintains an office." (Pub. Act 86—412, eff. Aug. 30, 1989) (1989 Ill. Legis. Serv. 2351, 2369 (West).)

Upon the filing of the petition in this case, we entered a rule against the IELRB to show cause why the relief should not be denied because section 16(c), as amended, would require the court to exercise original rather than appellate jurisdiction in violation of article VI, section 6, of the Illinois Constitution, which states:

"Appeals from final judgments of a Circuit Court are a matter of right to the Appellate Court ***. The Supreme Court may provide by rule for appeals to the Appellate Court from other than final judgments of Circuit Courts. The Appellate Court may exercise original jurisdiction when necessary to the complete determination of any case on review. The Appellate Court shall have such powers of direct review of administrative action as provided by law." Ill. Const. 1970, art. VI, §6.

In response, the IELRB argues that its cross-petition for enforcement is only an adjunct to the ongoing judicial review proceeding and that the request for an order of enforcement is based on the same criteria and encompasses the same issues as are raised in the direct appeal under Supreme Court Rule 335 (107 Ill. 2d R. 335). Thus, the agency argues, the cross-petition does not require this court to exercise original jurisdiction.

The IELRB specifically points to the Federal statute which permits the National Labor Relations Board (NLRB) to seek enforcement of its orders in the circuit courts of appeal. The IELRB argues the Illinois enforcement proceeding is a mirror image of a Federal proceeding. Federal proceedings to enforce NLRB orders are exclusively appellate since the court of appeals only reviews the propriety of the NLRB's order prior to determining whether to issue an order enforcing it.

To the extent the IELRB argues initial enforcement proceedings under the State Act mirror those under the Federal act, it is correct. The basic issues raised in the appeal are the legality of the IELRB's order and whether it is supported by the manifest weight of the evidence. However, section 16(b) of the Act provides that this court may punish violations of its orders of enforcement as in civil contempt. This is where the problem arises. Under Federal precedent, if approved or enforced by the reviewing court, the NLRB order necessarily becomes the order of the court, and a court of appeals, rather than the NLRB, has jurisdiction to enforce compliance. (*George Banta Co.*

*v. NLRB* (D.C. Cir. 1982), 686 F.2d 10.) Upon institution of contempt proceedings, the Federal court must necessarily employ a special master to hear evidence and make findings of fact. (*NLRB v. Maine Caterers, Inc.* (1st Cir. 1984), 732 F.2d 689; *NLRB v. Trailways, Inc.* (5th Cir. 1984), 729 F.2d 1013.) The court of appeals then reviews the findings of the special master to determine whether an order of contempt ought to be entered.

Although this court may not need to exercise original jurisdiction merely to enter an order directing a party to comply with an IELRB order, we would, unquestionably, have to exercise original jurisdiction to determine whether a party was in contempt for failing to abide by the terms of the enforcement order. This court does not have special masters (Ill. Const. 1970, art. VI, §14), and there is no express provision or authority which would permit this court to remand to some other entity, such as the circuit court, for the taking of evidence.

Under article VI, section 6, of the Illinois Constitution of 1970 (Ill. Const. 1970 art. VI, §6), the only jurisdiction the appellate court has in regard to administrative proceedings is "such powers of direct review" as the legislature may provide. On the other hand, article III (the judicial article) of the United States Constitution (U.S. Const., art. III) provides that the Federal judicial power is "vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." Thus, Congress can give the circuit courts of appeal original jurisdiction. It has done so in the National Labor Relations Act (NLRA), as amended. See 29 U.S.C. §160(e) (1988).

Section 16(c) of the Act, as amended, contemplates original jurisdiction. It speaks of the IELRB commencing an action for enforcement before the appellate court. No request for administrative review is necessary to invoke the provisions of that legislation. If the legislation were limited to allowing us to enter an order on administrative review which the administrative agency could have entered, a reasonable argument that the legislation was valid might be made. However, this is not the case.

We note an IELRB order is distinguishable from an NLRB order. Section 10(e) of the NLRA, as amended (29 U.S.C. §160(e) (1988)), provides the mechanism whereby the NLRB can seek enforcement of an order. The NLRB has no power to enforce its own orders. Compliance with an NLRB order is not obligatory until a court enters an order enforcing it. *In re NLRB* (1938), 304 U.S. 486, 82 L. Ed. 1482, 58 S. Ct. 1001.

Parties aggrieved by an order of the NLRB may seek review in

the court of appeals under section 10(f) of the NLRA, as amended. (29 U.S.C. §160(f) (1988).) If the NLRB has petitioned for enforcement, a respondent is entitled to join that proceeding and obtain review of the NLRB's order.

Whether it be a proceeding for enforcement or a petition for review, the scope of inquiry by the court of appeals is limited. On petition for enforcement, the court of appeals may not conduct a *de novo* consideration of the evidence but need only conclude there is substantial evidence to support the Board's conclusion in order to grant the order for enforcement. *NLRB v. Retail Store Employees Union, Local 876* (6th Cir. 1978), 570 F.2d 586.

 The State order is valid from the date of entry and the party against whom it was entered normally must seek a stay of the order pending appeal. (See *People ex rel. Carpentier v. Goers* (1960), 20 Ill. 2d 272, 170 N.E.2d 159; Ill. Rev. Stat. 1987, ch. 110, par. 3—111(1).) Supreme Court Rule 335(g) (107 Ill. 2d 335(g)) specifically provides for applications for stay of an agency order pending direct appeal. This indicates the order is effective upon entry and the party against whom it is directed must comply unless a stay is granted. See, *e.g.,* Ill. Rev. Stat. 1989, ch. 46, par. 9—22(4) (providing effect of order of State Board of Elections is not stayed unless by order of appellate court); contrast NLRB orders (see II C. Morris, The Developing Labor Law 1695-96 (2d ed. 1983)).

Finally, the IELRB argues Supreme Court Rule 335(h)(1) expressly contemplates that proceedings to enforce certain agency orders will be brought directly in the appellate court. Rule 335(h)(1) states:

> "Insofar as appropriate, the provisions of Rules 301 through 373 (except for Rules 321 through 326) are applicable to proceedings under this rule. As used in any applicable rule, the term 'appellant' includes a petitioner and the term 'appellee' includes a respondent in proceedings to review or enforce agency orders." (107 Ill. 2d R. 335(h)(1).)

We acknowledge the IELRB's argument initially appears plausible, given the express language of the rules. However, it ignores the historical context in which Rule 335 was written. Rule 335 was adopted by the supreme court after the legislature provided for direct appeals to the appellate court under section 41 of the Environmental Protection Act (Ill. Rev. Stat. 1987, ch. 111½, par. 1041). The statute became effective in 1970 (Pub. Act 76—2429, eff. July 1, 1970 (1970 Ill. Laws 873, 892)), and the rule was adopted in 1971. EPA orders were the only ones which could be appealed to this court directly until the

legislature started adding additional agencies.

It is significant that under the Environmental Protection Act, the EPA may institute proceedings for *enforcement* before the Pollution Control Board. (Ill. Rev. Stat. 1987, ch. 111½, par. 1030 *et seq.*) There is a complex procedural mechanism for the filing of complaints and hearings in enforcement proceedings before the Pollution Control Board which may result in sanctions described in section 42 of the Environmental Protection Act (Ill. Rev. Stat. 1987, ch. 111½, par. 1042). An aggrieved party to an enforcement proceeding before the Pollution Control Board may then appeal under the provisions of section 41 of the Environmental Protection Act directly to the appellate court. See Ill. Rev. Stat. 1987, ch. 111½, par. 1041(c).

We note the IELRB has recently enacted regulations providing for compliance hearings. (14 Ill. Reg. 1322, 1331 (adopted Jan. 5, 1990).) However, those regulations were not effective at the time of the instant proceeding. They do not change our analysis of the unconstitutionality of amended section 16(c) of the Act. Since enforcement-compliance procedures brought pursuant to the amended section necessarily involve the exercise of original jurisdiction by this court, we find the section is unconstitutional.

### IV. SUMMARY

We affirm that part of the IELRB's order which determined the issues of waiver, the timeliness of the complaint, and the adequacy of the bargaining demand.

We reverse that portion which found the teacher evaluation plans were subject to mandatory bargaining. We hold the substantive criteria, weight to be given various factors, and assessment of competency are matters of inherent managerial policy and, while they are to be developed in cooperation with the district teachers, they are not subject to mandatory bargaining. We remand for a consideration of whether the procedural aspects of the initial evaluation and remediation plans, which the IELRB properly determined are subjects of mandatory bargaining, were bargained.

Since we find the amendment to section 16 of the Act unconstitutional, we deny the petition for enforcement.

Affirmed in part; reversed in part and remanded.

LUND and GREEN, JJ., concur.