ALTON COMMUNITY UNIT SCHOOL DISTRICT No. 11, Counties of Madison and Jersey, Petitioner, v. ILLINOIS EDUCATIONAL LABOR RELATIONS BOARD *et al.*, Respondents.

Fourth District No. 4—90—0255

Opinion filed February 21, 1991.

C. Dana Eastman, Jr., of Thomas, Mottaz, Eastman & Sherwood, of Alton, and Everett E. Nicholas, Jr., Philip H. Gerner III, and Timothy A. Bridge, all of Robbins, Schwartz, Nicholas, Lifton & Taylor, Ltd., of Chicago, for petitioner.

Neil F. Hartigan, Attorney General, of Springfield (Robert Ruiz, Solicitor General, and Deborah L. Ahlstrand, Assistant Attorney General, of Chicago, of counsel), for respondent Illinois Educational Labor Relations Board.

Gregory J. Malovance and Steven E. Mitchel, both of Winston & Strawn, of Chicago, for respondent Alton Education Association.

JUSTICE GREEN delivered the opinion of the court:

Acting pursuant to section 15 of the Illinois Educational Labor Relations Act (Act) (Ill. Rev. Stat. 1987, ch. 48, par. 1715), on February 3, 1988, and May 25, 1988, respondent Alton Education Association, IEA-NEA (Association), filed a charge and an amended charge, respectively, with respondent Illinois Educational Labor Relations Board (IELRB) alleging the commission of unfair labor practices against petitioner Alton Community Unit School District No. 11,

Counties of Madison and Jersey, State of Illinois (District). The Association was the duly elected bargaining representative for the educational employees of the District.

On June 14, 1988, after an investigation, the IELRB ordered a complaint to issue. After hearings before a hearing officer, on March 12, 1990, the IELRB issued an opinion and order finding the District guilty of failing to bargain in good faith (Ill. Rev. Stat. 1987, ch. 48, par. 1714(a)(5)), refusing to sign a collective-bargaining agreement (Ill. Rev. Stat. 1987, ch. 48, par. 1714(a)(6)) and, derived from that conduct, "[i]nterfering, restraining or coercing employees in the exercise of the rights guaranteed under [the] Act" (Ill. Rev. Stat. 1987, ch. 48, par. 1714(a)(1)). (*Alton Community Unit School District 11*, 6 Pub. Employee Rep. (Ill.), par. 1047, No. 88—CA—0032—S (Illinois Educational Labor Relations Board, Mar. 12, 1990).) Petitioner has taken administrative review to this court. We reverse and remand to the IELRB with directions.

The dispute involved here arises from the operation of section 24A—4 of the School Code, which states in pertinent part:

> "Each school district shall develop, in cooperation with its teachers or, where applicable, the exclusive bargaining representatives of its teachers, an evaluation plan for all teachers in contractual continued service." Ill. Rev. Stat. 1987, ch. 122, par. 24A—4.

The evidence shows that negotiations between the Association and the District for a collective-bargaining agreement for the 1986-88 period were difficult, resulting in an 18-day strike in the autumn of 1986. One of the areas of disagreement concerned the contents of the plan required by section 24A—4 of the School Code. In order to bring the District schools back into operation, lessen the strife, and reach a collective-bargaining agreement for the 1986-88 period, the parties agreed to defer resolution of the evaluation plan issue by entering into an agreement, which is section 3.3 of that 1986-88 contract. Section 3.3 states:

> "*Formal Evaluation.* A joint committee shall be established with equal representation from both parties to develop the evaluation plan in accordance with state guidelines and submitted to the Board of Education for approval. Following state approval of the plan, bargaining shall then resume on the aspects of the plan to be included in the contract. The evaluation plan shall not be implemented by the Board of Education until bargaining is concluded."

A joint committee was formed, and it agreed on an evaluation plan. The District refused to sign a document containing the plan. The IELRB found the plan was a collective-bargaining agreement and that the District violated section 14(a)(6) of the Act, which makes the failure to sign a collective-bargaining agreement an unfair labor practice. The parties admittedly bargained the question of which portion of the plan was to become part of the "contract," *i.e.*, the 1986-88 collective-bargaining agreement of which section 3.3 was a part. They were unable to reach agreement. The parties agree that the phrase in section 3.3, "to be included in the contract," refers to being subject to the grievance and arbitration provisions of the 1986-88 contract. Section 10(c) of the Act requires collective-bargaining agreements negotiated under the Act to contain a "grievance resolution procedure" which "shall provide for binding arbitration of disputes concerning the administration or interpretation of the agreement." (Ill. Rev. Stat. 1987, ch. 48, par. 1710(c).) The IELRB accordingly held that despite the wording of section 3.3, the Association did not have to bargain with the District as to whether provisions of the evaluation plan became subject to the grievance and arbitration provision of the 1986-88 contract. The IELRB determined that under section 10(c), the plan became subject to the grievance and arbitration provision of the 1986-88 contract unless the Association voluntarily agreed otherwise. Accordingly, the IELRB held the District failed to bargain in good faith with the Association when it bargained to impasse on this question.

■ The parties do not dispute that if the IELRB properly found the District had committed the unfair labor practice of refusing to sign a collective-bargaining agreement or of failing to bargain in good faith, for each violation the IELRB could also find the District guilty of a violation of section 14(a)(1) of the Act for "[i]nterfering, restraining or coercing employees in" their exercise of rights conferred by the Act. (Ill. Rev. Stat. 1987, ch. 48, par. 1714(a)(1).) Section 14(a)(1) of the Act is a catchall provision, a violation of which may sometimes arise from the commission of another unfair labor practice. See *Board of Education v. Illinois Educational Labor Relations Board* (1988), 170 Ill. App. 3d 490, 524 N.E.2d 711.

In order for the reader to acquire an understanding of the basis of the instant dispute, a recitation of facts is necessary. Section 3.3 of the collective-bargaining agreement for 1986-88 went into operation during September 1986. Shortly after that agreement was executed, Association president Ruth Henderson and District superintendent David Van Winkle met to discuss forming a joint committee, as required by section 3.3 of the parties' 1986-88 collective-bargaining

agreement. Henderson and Van Winkle decided that the Association and the District would each have six representatives, including a co-chairman, on the committee. Van Winkle appointed the District representatives, including Alton High School assistant principal Leonard Hawthorne as cochair. Henderson served as cochair for the Association and appointed the remaining Association representatives.

The evaluation plan committee held its initial meeting on October 15, 1986, at which time the committee cochairs discussed the committee format and procedures. At the subsequent meeting, the evaluation plan committee divided itself into six subgroups, each comprised of a single Association representative and a single District representative. Subgroups met several times during the autumn of 1986 and extracted provisions from other evaluation plans for possible inclusion in the committee's plan.

The subgroups then formed four-member subgroups, which were responsible for reviewing the provisions collected by the two-member subgroups and developing the language for the committee's evaluation plan. The four-member subgroups met approximately six times.

In May 1987, the evaluation planning committee held its first substantive meeting as a complete committee. By the end of June 1987, the committee as a whole had met seven times. During these meetings, the parties discussed proposed language and attempted to reach agreement. The committee first resolved aspects of the plan over which there was little or no disagreement. In several areas, the Association opposed a District proposal, such as (1) whether job descriptions would contain language that the employees would perform "other jobs or tasks as assigned" by their immediate supervisors, (2) whether the employees would be required to keep their rooms attractive, and (3) the date by which evaluations must be completed. The disagreements over the plan's provisions and counterproposals were expressed between the two sets of representatives of the committee, and the parties eventually resolved this disagreement by either adopting the Association's counterproposal, or by compromise. The agreed-upon provisions were then incorporated into the final evaluation plan.

In June 1987, after having met 18 times, considering subgroup meetings and meetings of the entire evaluation plan committee, the parties completed the evaluation plan. The completed evaluation plan was submitted to the District's board of education, and, on July 21, 1987, the board of education approved the plan. On July 24, 1987, the District was notified that the Illinois State Board of Education had also approved the plan.

Pursuant to section 3.3 of the 1986-88 agreement, the parties resumed meeting in September 1987 to discuss which aspects of the evaluation plan would be incorporated in the 1986-88 collective-bargaining agreement, and thereby be subject to the grievance arbitration provision of that agreement. The parties initially met on September 17, 1987.

The District offered three proposals at the September 17 meeting. It first proposed that only the areas of "performance observation," "summative evaluation," "professional growth plan," and "rebuttal" should be included in the collective-bargaining agreement. After the District presented its first proposal, the parties caucused, and the District returned with a second proposal. The District added the areas of "remediation," "unsatisfactory evaluation," and "consulting teacher" to the procedural aspects it had initially proposed, and concluded that these aspects were also procedural. The District's third proposal was the same as its second proposal. During the September 17 meeting, the District maintained the position that only procedural aspects of the plan would be included in the collective-bargaining agreement, *i.e.*, matters subject to grievance procedures.

The Association's initial position was that the entire evaluation plan should be incorporated in the collective-bargaining agreement. At the September 17, 1987, negotiating session, the Association's only counterproposals involved the deletion of proposed contract language on nontenured teachers, the rating system, and a statement of philosophy.

At the next negotiating session on September 23, 1990, the District resubmitted its most recent proposal and reiterated its position that only procedural aspects of the evaluation plan should be subject to the contractual grievance procedure. The Association's chief spokesperson, Philip Robbins, stated that the Association was resubmitting its initial proposal that the entire evaluation plan must be included in the collective-bargaining agreement. Robbins then stated the parties could "start from ground zero and negotiate an entire [evaluation] plan," or the Association would file an unfair labor practice charge based upon the District's alleged refusal to bargain in good faith. Robbins indicated later in the session that the Association would file the unfair labor practice charge.

Between September 23, 1987, and January 27, 1988, an exchange of letters between Van Winkle and Henderson took place. On February 3, 1988, the Association filed an unfair labor charge against the District. The last meeting of the parties occurred on August 11, 1988. The District restated its earlier position that only "procedural" as-

pects of the plan should be subject to the grievance procedure and offered no further proposals. The Association offered no new proposal. No later bargaining meetings took place.

Although the facts of this case are simple, the issues presented are complex. Following usual IELRB procedure, the evidence was presented to a hearing officer, who then filed a recommended decision and order which made certain findings of an unfair labor practice against the District. (*Alton Community Unit School District 11*, 5 Pub. Employee Rep. (Ill.) par. 1054, No. 88—CA—0032—S (Illinois Educational Labor Relations Board, hearing officer's recommended decision and order, Mar. 1, 1989).) Exceptions were taken by the District, and the matter was considered by the IELRB, which then entered the opinion and order (*Alton Community Unit School District 11*, 6 Pub. Employee Rep. (Ill.) par. 1047, No. 88—CA—0032—S (Illinois Educational Labor Relations Board, Mar. 12, 1990)), from which administrative review has been taken. Its findings and determinations differed somewhat from those of the hearing officer, suggesting that both the hearing officer and the IELRB struggled with the issues involved here.

██ █ At the heart of the dispute is the question of whether the teacher evaluation plan developed by the joint committee, as provided for by section 3.3 of the 1986-88 collective-bargaining agreement, was, itself, an agreement reached through collective bargaining. Section 14(a)(6) of the Act makes the failure of an educational employer, such as the District, to sign "a collective bargaining agreement" an unfair labor practice. (Ill. Rev. Stat. 1987, ch. 48, par. 1714(a)(6).) The hearing officer found the District's refusal to sign the evaluation plan was not a violation of section 14(a)(6) of the Act because the plan's relationship to the 1986-88 master agreement, which the District had signed, was such that the evaluation plan became part of that agreement and further signing was unnecessary. However, we agree with the IELRB that a further signing was required if the evaluation plan was collectively bargained.

██ █ As we later explain, the theory that the District had failed to bargain in good faith under section 14(a)(5) by bargaining to impasse, and the question of what portions of the plan were to become subject to the grievance and arbitration provisions of the 1986-88 contract arise from section 10(c) of the Act. It states, in part, that every collective-bargaining agreement arising under the Act "shall contain a grievance resolution procedure" which "shall provide for binding arbitration of disputes concerning the administration or interpretation of the agreement." (Ill. Rev. Stat. 1987, ch. 48, par. 1710(c).) If the evaluation plan

was not an agreement reached by collective bargaining, the failure-to-bargain-in-good-faith finding would be without foundation.

In its decision and order, the IELRB began its consideration of whether the teacher evaluation plan was collectively bargained by noting the ambiguity in section 3.3 of the 1986-88 agreement. It noted that the first sentence of section 3.3 speaks of the committee's duty to "develop" a plan rather than to "bargain" for a plan which tended to indicate bargaining was not intended. The IELRB then considered the second sentence of section 3.3, which states that "bargaining" was to resume after approval of the plan. The IELRB deemed that sentence was ambiguous as to whether the word "bargaining," which was to resume, referred to bargaining in regard to the plan or bargaining in regard to inclusion in the 1986-88 agreement. The IELRB also noted that the parties' conduct was ambiguous. It stated the non-adversarial format used indicated bargaining was not taking place; but the conduct of the committee work, whereby some proposals by District representatives were objected to by the Association representatives, and then compromises would be made by the District representatives, indicated bargaining did take place. The IELRB then reasoned that the District was required to bargain as to the entire teacher evaluation plan and, under the evidence, it could not find the Association had "clearly and unmistakably waived" that right. Accordingly, the IELRB determined the evaluation plan was a collective-bargaining agreement which the District was required to sign.

In holding the District had a duty to bargain as to all aspects of the evaluation plan, the IELRB relied upon its decision in *LeRoy Community Unit School District 2*, 5 Pub. Employee Rep. (Ill.), par. 1131, No. 88—CA—0031—S (Illinois Educational Labor Relations Board, June 23, 1989), as to which appeal to this court was pending, and other of its similar rulings. However, after the IELRB issued its decision herein, this court issued its opinion on administrative review of the IELRB's decision in *LeRoy*, wherein we reversed in part, holding that a school district had a duty to bargain only as to the procedural aspects of a teacher evaluation plan and not as to its substantive aspects. *Board of Education, LeRoy Community Unit School District No. 2 v. Illinois Educational Labor Relations Board* (1990), 199 Ill. App. 3d 347, 556 N.E.2d 857, *appeal allowed* (1990), 133 Ill. 2d 552.

The IELRB urges us to reconsider our holding in *LeRoy* in regard to the duty of a school district to bargain the substantive aspects of a teacher-evaluation plan. However, if we do not overrule *LeRoy*, the IELRB recognizes that it should be required to reconsider its determi-

nation as to whether the evaluation plan was bargained here, and it therefore requests that we remand this cause for it to make a decision based on proper considerations as to whether the plan was bargained. As *LeRoy* is now before the supreme court, we see no useful purpose for us to reconsider a ruling thereon. For reasons we will explain, we conclude we must reverse at least portions of the order on review and remand to the IELRB regardless of the outcome of *LeRoy*.

■ We agree with the IELRB and the Association that irrespective of the outcome in *LeRoy*, teacher evaluation plans are, at least, subjects of permissible collective bargaining. We agree that, as set forth in the IELRB decisions in *LeRoy* and *Chicago Board of Education, District 299*, 5 Pub. Employee Rep. (Ill.) 1092, No. 86—CA—0098—C (Illinois Educational Labor Relations Board, May 2, 1989), the give and take between a committee of representatives from employers and employees which resemble that typical of labor negotiations, can, under some circumstances, constitute collective bargaining. We find the evidence here was sufficient to support, but not to require, a determination that the parties bargained the terms of the teacher evaluation plan in their entirety—regardless of whether bargaining was mandatory in regard to substantive aspects of the plan.

The Association maintains the evidence showed that as a matter of law the parties bargained the evaluation plan. It suggests that a Pennsylvania statutory provision drawing a distinction between "collective bargaining" and "meeting and discussing" was rejected by the General Assembly and the Governor in the passing of an amendatory veto of the Act. (See II Senate Journal, 83d Ill. Gen. Assem. (June 23, 1983), at 3223, 3225, 3227 (1983 Sess.) (text of Senate Amendment No. 4 to House Bill 1530); 83d Ill. Gen. Assem., Senate Proceedings, June 23, 1983, at 154, 158 (discussion and vote on Senate Amendment No. 4 to House Bill 1530); Governor's Veto Messages 1983, House Bill 1530 (Sept. 23, 1983).) We conclude we need not address that contention.

We have related evidence which, within the expertise of the IELRB, can be taken to indicate the existence of bargaining between the District and the Association over the evaluation plan. However, as the IELRB pointed out, other evidence tended to show that bargaining was not taking place. The committee operated in a manner to avoid being adversarial. Section 3.3 of the contract spoke of the committee's responsibility being to "develop a plan" while, in the next paragraph, addressing bargaining over the portions of the plan to be included in the 1986-88 contract. We cannot conclude, as a matter of law, that the teacher evaluation plan arose from collective bargaining.

██ In addition to disagreeing with the IELRB determination that the teacher evaluation plan was reached through collective bargaining, the District maintains the terms of section 3.3 of the 1986-88 collective-bargaining agreement constituted a waiver by the Association of bargaining as to the plan. The District argues that the direct wording of section 3.3, which speaks of the function of the evaluation plan committee being to "develop" a plan rather than to negotiate or bargain as to a plan, negates bargaining within the committee. We have previously discussed the matter in connection with the IELRB determination that bargaining did take place in regard to the evaluation plan. We conclude the wording of section 3.3 was sufficiently ambiguous that the IELRB could properly find no waiver of bargaining occurred in regard to the development of the plan.

The existence of a duty on the part of the District to bargain as to all aspects of the evaluation plan was presumed by the IELRB and was material to its decision that collective bargaining was not waived by the Association and actually took place. Accordingly, if the holding of this court in *LeRoy* that a district is not required to bargain as to substantive aspects of an evaluation plan is upheld by the supreme court, the IELRB must make a new decision as to whether the plan arose from collective bargaining.

As we previously stated, the IELRB found the District failed to bargain in good faith because it bargained to impasse the question of whether provisions of the evaluation plan were to be "included in the contract," *i.e.*, subject to the grievance and arbitration provisions of the 1986-88 collective-bargaining agreement. Section 10(c) of the Act states in pertinent part:

> "The collective-bargaining agreement negotiated between representatives of the educational employees and the educational employer shall contain a grievance resolution procedure which shall apply to all employees in the unit and shall provide for binding arbitration of disputes concerning the administration or interpretation of the agreement." (Ill. Rev. Stat. 1987, ch. 48, par. 1710(c).)

We have related the substance of the bargaining between the parties after the evaluation plan was completed. The apparent theory of the IELRB is that after the parties were unable to agree as to which portions of the plan were to become subject to the grievance and arbitration procedure of the parties' 1986-88 contract, section 10(c) required the District to concede to the Association that all of the provisions of the evaluation plan were subject to the grievance and arbitration provisions of the 1986-88 contract. We disagree.

■ We recognize that clear express language in a collective-bargaining agreement arising under the Act is necessary to exclude a dispute arising under the agreement from the application of grievance and arbitration provisions. (*Staunton Community Unit School District No. 6 v. Illinois Educational Labor Relations Board* (1990), 200 Ill. App. 3d 370, 558 N.E.2d 751; *Board of Governors of State Colleges & Universities v. Illinois Educational Labor Relations Board* (1988), 170 Ill. App. 3d 463, 524 N.E.2d 758.) However, that is not the issue here. The second sentence of section 3.3 of the 1986-88 collective-bargaining agreement contained an express, unambiguous agreement that after the "State approval of the plan, bargaining" would take place as to the portion of the plan which would be subject to the grievance and arbitration procedures. If parties can waive application of grievance and arbitration provisions of a collective-bargaining agreement by clear express language, logic dictates that they can also agree to bargain as to what portion(s) of the plan would be subject to the grievance and arbitration provisions of the contract.

In *Chicago Board of Education*, 6 Pub. Employee Rep. (Ill.), par. 1048, No. 88—CA—0056—C (Illinois Educational Labor Relations Board, March 12, 1990), the IELRB stated that the rule permitting waiver of grievance and arbitration provisions to certain aspects of a collective-bargaining agreement, when expressly stated and resulting from good-faith collective bargaining, furthers the theory of collective bargaining. That IELRB also stated:

"Finally, although we have concluded that the parties may legally waive the applicability of the grievance and arbitration process as to specified matters, the statutory policy favoring arbitration is too strong to permit one party to precondition bargaining on agreement that a mandatory subject of collective bargaining be excluded from arbitration. To protect the policy favoring arbitration from such erosion, *we conclude that the exclusion of a mandatory subject from the grievance and arbitration procedure is a permissive subject of bargaining. A party may not insist to impasse on such an exclusion,* and the opposing party need not consider such an exclusion if it is proposed. Section 10(c) confers on an exclusive representative a right to a grievance and arbitration procedure which the exclusive representative cannot be compelled to waive. Were we to conclude that an exclusion of a mandatory subject from the grievance and arbitration process is a mandatory subject of bargaining, we would eviscerate Section 10(c), as well as the policy of the Act favoring the grievance and arbitration process." (Emphasis

added.) 6 Pub. Employee Rep. (Ill.), par. 1048, No. 88—CA—0056—C, at IX—149.

■ While exclusion of a mandatory or permissive subject of bargaining from grievance and arbitration provisions cannot be required, and a party may not be able to insist to impasse that some aspect be excluded from those provisions, such rules do not prohibit parties from freely and independently agreeing to bargain as to such matters. No case has been called to our attention holding that parties may not agree to collectively bargain an issue such as that involved here and be bound by the agreement to do so.

If the effect of the second sentence of section 3.3 was that the parties would merely discuss which portions of the teacher evaluation plan would be subject to the grievance and arbitration provisions of the contract and what portions would be excluded from its operation under the IELRB's interpretation, the District failed to meet that objective by agreeing to section 3.3 and the bargaining which took place was useless. While some slight evidence indicated some negotiators for the Association thought that all parts of the plan were to be subject to the grievance and arbitration provisions of the 1986-88 agreement, the parties engaged in negotiations and agreement was reached as to making certain aspects of the plan subject to grievance and arbitration provisions.

Negotiators believed they had agreed to collectively bargain which aspects of the plan would be subject to the contractual grievance and arbitration procedures. No evidence indicates that, at any time during the bargaining, the Association took the position that it did not have to bargain. Rather, the bargaining broke down because of the insistence of the District it would not negotiate as to application of grievance and arbitration to substantive aspects of the plan, and of the Association that all provisions of the plan would be subject to arbitration. This is borne out by the fact that the amended charge filed by the Association alleged only that the District had failed and refused to sign the agreement and "since September 17, 1987, *** [had] failed and refused to bargain in good faith regarding *a mandatory subject of bargaining* namely, submission of [the evaluation instrument] to a grievance resolution procedure that includes binding arbitration." (Emphasis added.)

■ If we were correct in *LeRoy* that substantive aspects of an evaluation plan are not mandatory subjects of bargaining, then the District cannot properly be held to have committed an unfair labor practice against the Association by bargaining this matter to impasse. Accordingly, the IELRB's finding that the District committed an un-

fair labor practice based on bargaining to impasse, and the derivative finding pursuant to section 14(a)(1) of the Act, cannot stand. However, if the supreme court holds that substantive provisions of a teacher evaluation plan developed pursuant to section 24A—4 of the School Code are matters of mandatory bargaining, the finding of unfair labor practice against the District may be supported by the District's refusal to bargain on the issue of the application of the grievance and arbitration procedure to substantive provisions of the evaluation plan.

■■■ We reverse the decision of the IELRB and remand the cause to that agency pursuant to sections 3—111(a)(6) and (a)(7) of the Administrative Review Law (Ill. Rev. Stat. 1989, ch. 110, pars. 3—111(a)(6), (a)(7)). We suggest that agency withhold ruling until the decision of the supreme court in *LeRoy*.

■■■ If the supreme court upholds our determination that the question of substantive provisions of a teacher evaluation plan under section 24A—4 of the School Code is not subject to mandatory bargaining, the IELRB shall reconsider its ruling on the question of whether the plan here was the result of collective bargaining. If that issue is decided in favor of the Association, the IELRB may reenter its order finding a violation of sections 14(a)(6) and derivatively 14(a)(1) in that regard and impose appropriate cease and desist and other orders. Under these circumstances, the reversal of the findings in regard to sections 14(a)(5) and derivatively 14(a)(1) of the Act will remain in force.

■■■ If the supreme court determines in *Leroy* that substantive as well as procedural aspects of a teacher evaluation plan are subject to mandatory bargaining, the IELRB shall reinstate its findings pursuant to sections 14(a)(6) and derivatively 14(a)(1) of the Act. The IELRB may then consider whether the District was guilty of failing to bargain in good faith because of its refusal to consider application of substantive provisions of the plan to the grievance and arbitration provisions of the parties' collective-bargaining agreement for 1986-88. If the IELRB finds the District guilty of section 14(a)(5) and, derivatively, section 14(a)(1), it may also impose appropriate cease and desist and other orders against the District in this respect.

Reversed and remanded with directions.

STEIGMANN and KNECHT, JJ., concur.