GEORGETOWN-RIDGE FARM COMMUNITY UNIT SCHOOL DISTRICT No. 4, Petitioner, v. ILLINOIS EDUCATIONAL LABOR RELATIONS BOARD *et al.*, Respondents.

Fourth District   No. 4—91—0795

Opinion filed December 28, 1992.

Wendell W. Wright, of Wright Law Offices, of Danville, for petitioner.

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, and Jerald S. Post, Assistant Attorney General, of Chicago, of counsel), for respondent Illinois Educational Labor Relations Board.

Sandra J. Holman, of Illinois Education Association-NEA, of Springfield, for respondent Georgetown-Ridge Farm Education Association.

JUSTICE LUND delivered the opinion of the court:

This is a petition for direct administrative review brought by the Georgetown-Ridge Farm Community Unit School District No. 4

(District), pursuant to section 16(a) of the Illinois Educational Labor Relations Act (Act) (Ill. Rev. Stat. 1989, ch. 48, par. 1716(a)), Supreme Court Rule 335 (134 Ill. 2d R. 335), and sections 3—101 through 3—112 of the Code of Civil Procedure (Ill. Rev. Stat. 1989, ch. 110, pars. 3—101 through 3—112). The petition seeks reversal of a decision by the Illinois Educational Labor Relations Board (IELRB), finding the District had committed several unfair labor practices in violation of sections 14(a)(1), (a)(3), and (a)(5) of the Act (Ill. Rev. Stat. 1989, ch. 48, pars. 1714(a)(1), (a)(3), (a)(5)).

The issues raised on appeal are (1) whether the actions taken by the District in reduction of employee hours, increase in hours, elimination of health insurance benefits, reclassification from a certified position to a noncertified position, and dismissal from employment are mandatory subjects of bargaining in this case; (2) whether the District in fact engaged in collective bargaining with the Georgetown-Ridge Farm Education Association, IEA-NEA (Association), over the reduction in force (RIF) decisions; and (3) whether the District's dismissal of Buckellew and the other part-time custodial employees and the conversation with the Association president constituted unfair labor practices.

## I. FACTS

In connection with the case before the IELRB, the parties stipulated to certain facts, which will give a background of events leading up to the filing of the complaints by the IELRB against the District. A summary of the stipulated facts follows.

The District is a kindergarten through twelfth-grade school district governed by an elected board of education (School Board), and it is an educational employer within the meaning of section 2(a) of the Act (Ill. Rev. Stat. 1989, ch. 48, par. 1702(a)). At all times material to the case, the District operated seven buildings. The Association has been the exclusive representative, within the meaning of sections 2(c) and 2(d) of the Act (Ill. Rev. Stat. 1989, ch. 48, pars. 1702(c), (d)), of the certified and noncertified employees. Prior to 1986, Georgetown and Ridge Farm were two separate school districts. In 1986, the two districts consolidated to create the District, and it followed the collective-bargaining agreement which was then in place in Georgetown.

The District and the Association negotiated annual agreements for the 1987-88 and 1988-89 school years. Pursuant to a consent agreement, an election was conducted in September 1989 on the Association's petition to add the District's noncertified employees to

the existing bargaining unit. After that election, the Association was certified as the exclusive representative of the District's full-time and regular part-time education service personnel employees (ESPs). At all material times and until the end of school year 1989-90, Derry Behm served as the District's superintendent and agent. During school year 1989-90, Behm was responsible for preparing the School Board meeting agenda.

The parties agreed that one of the issues to be presented to the IELRB was whether certain custodial-maintenance employees were "part-time" employees or "temporary" or "substitute" employees. Until the end of school year 1989-90, Marvin Buckellew was employed by the District as a custodial-maintenance employee, and he was an educational employee within the meaning of section 2(b) of the Act (Ill. Rev. Stat. 1989, ch. 48, par. 1702(b)). In addition to Buckellew, there were nine other custodial-maintenance employees. All these employees were eligible to vote in the September 1989 representation election.

The parties engaged in collective-bargaining negotiations for certified employees from January 1989 to January 1990. In January 1990, a contract was ratified and executed. In December 1989, the Association demanded bargaining, and parallel negotiations began regarding wages, hours, and terms and conditions of employment for the ESPs for the 1989-90 school year. Those negotiations subsequently resulted in an agreement ratified in June 1990. Prior to May 1990, there was no collective-bargaining language covering any of the District's noncertified employees or any of their terms and conditions of employment. Negotiations were begun in January 1990 on a comprehensive 1990-91 school year collective-bargaining agreement covering all bargaining-unit employees. These negotiations were taking place simultaneous to, but separately from, the noncertified employee negotiations for the 1989-90 school year. In July 1990, agreement on the 1990-91 contract was reached and ratified.

In October 1989, the District notified Buckellew and the other custodial-maintenance employees that their regular hours were to be reduced from eight hours per day, five days a week, to four hours per day, five days a week. From that time until the end of the school year, Buckellew worked the reduced hours. In January 1990, Buckellew, through his Association-retained attorney, notified Behm that he believed the reduction of his hours violated section 10—23.5 of the School Code of 1961 (School Code) (Ill. Rev. Stat. 1989, ch. 122, par. 10—23.5). He requested that his hours be restored and that he be made whole for any losses. Behm responded

that Buckellew had never been employed as a full-time employee. Buckellew's attorney filed a complaint on his behalf in Vermilion County circuit court, alleging violations of section 10—23.5 of the School Code. The District was served a copy of this complaint on February 5, 1990.

On February 12, 1990, Behm recommended to the School Board the dismissal of all part-time custodial-maintenance employees, including Buckellew, effective the last day of the 1989-90 school year. Behm's written recommendation, which is contained in the agenda for the School Board's February 12, 1990, meeting, noted that the District was being sued by the Association on behalf of Buckellew, claiming that his hours had been improperly reduced. It then stated, "If having part-time employees is going to be this much hassle, I recommend that you inform the following that their employment will terminate May 25, 1990." The recommendation then listed the names of all part-time custodial-maintenance employees, including Buckellew. On February 26, 1990, the District conducted a public hearing concerning proposed reductions in certified employees. That hearing did not address any reductions in noncertified employees. On March 5, 1990, the School Board adopted Behm's recommendation and voted to dismiss all such employees. On March 12, 1990, the Association submitted cost-saving alternatives to reduction in certified employees. Also, pursuant to Behm's recommendation, the School Board approved notices of dismissal for all custodial-maintenance employees, reduced the hours of cafeteria employees from six hours per day to five hours per day, reclassified certified employee Bernadine Spitz as a personal aide, and subjected some (but not all) the District's teachers, aides, cooks, and clerical employees to a RIF. (Under section 24—12 of the School Code, tenured teachers who are dismissed for economic reasons have recall and reemployment rights for at least one year (Ill. Rev. Stat. 1989, ch. 122, par. 24—12).) The circuit court dismissed Buckellew's complaint on a motion for summary judgment, and that decision was appealed to the Fourth District Appellate Court in *Buckellew v. Board of Education of Georgetown-Ridge Farm Community Unit School District No. 4* (1991), 215 Ill. App. 3d 506, 575 N.E.2d 556, *appeal denied* (1991), 142 Ill. 2d 652, 584 N.E.2d 127.

Effective March 12, 1990, cafeteria employees working less than six hours per day were ineligible for District-paid health insurance benefits. They work a nine-month year. As a result of the reduction in hours, the affected employees will also earn approximately $1,100 less during school year 1990-91.

All employees given notice of layoff or dismissal on March 12, 1990, had their health insurance benefits ended at the close of school year 1989-90, and the District made no health insurance contributions for those employees after the end of the school year, did not make health insurance contributions covering the summer months of 1990, and only made contributions for school year 1990-91 if those employees were reemployed in some capacity during that school year. The District accepted Spitz' resignation from her personal aide position, to which she had been assigned for school year 1990-91, and she was currently not working for the District in any capacity. The District had not made any health insurance payments for Spitz since the end of the 1989-90 school year.

In the certified employees' collective-bargaining agreement for the 1989-90 school year, the parties had agreed that the various school libraries were to be open to students and teachers during the entire school year. Library clerks, who are noncertified employees, work in the libraries under the supervision of the library supervisor. During the first week of May 1990, the District announced that the libraries would be open three additional days and that the clerks were required to work those additional days. The Association protested this change in the clerks' work year and demanded bargaining. The District then made the three extra days voluntary. All but one of the clerks worked the extra days. They were paid based upon their *per diem* salary during the 1989-90 school year.

On May 29, 1990, the District hired three of its dismissed custodial-maintenance employees as temporary employees. Those people worked during school year 1990-91. However, these new positions were not the same or substantially equivalent to their former positions. Buckellew was not offered any of those positions.

On June 15, 1990, the Association filed two charges alleging unfair labor practices against the District. In October 1990, the IELRB filed amended complaints against the District in two cases based upon these charges. In case No. 90—CA—0047—S, the IELRB alleged:

(1) the Association had filed an unfair labor practice charge against the District in June 1990;

(2) the District was an educational employer within the meaning of section 2(a) of the Act (Ill. Rev. Stat. 1989, ch. 48, par. 1702(a));

(3) the Association was an exclusive representative of a bargaining unit comprised of certified and noncertified educational employees employed by the District, pursuant to section 2(d) of the Act (Ill. Rev. Stat. 1989, ch. 48, par. 1702(d)); and

(4) on or about March 5, 1990, the District had taken the following actions without first bargaining to impasse with the Association: (a) dismissing all part-time custodial-maintenance employees; (b) reducing and/or changing the hours of cafeteria employees; (c) reclassifying a certified employee to a noncertified position; (d) eliminating, reducing, and/or otherwise changing employees' health insurance benefits and/or coverage; and (e) changing the hours of work for library clerks.

The IELRB further alleged this conduct had interfered with, restrained, or coerced employees in the exercise of rights guaranteed them under the Act, in violation of section 14(a)(1) of the Act (Ill. Rev. Stat. 1989, ch. 48, par. 1714(a)(1)). It was also alleged that by its conduct the District had acted unilaterally and without adequate prior notice, and had refused to bargain collectively in good faith with the Association as the exclusive representative of employees, in violation of section 14(a)(5) of the Act (Ill. Rev. Stat. 1989, ch. 48, par. 1714(a)(5)). The complaint asked for all appropriate relief under section 15 of the Act (Ill. Rev. Stat. 1989, ch. 48, par. 1715).

The amended complaint in case No. 90—CA—0048—S alleged:

(1) Buckellew was employed as a part-time custodian by the District and was an educational employee under section 2(b) of the Act (Ill. Rev. Stat. 1989, ch. 48, par. 1702(b));

(2) Derry Behm, as superintendent of schools for the District, was a supervisory and/or managerial employee within the meaning of sections 2(g) and/or 2(o) of the Act (Ill. Rev. Stat. 1989, ch. 48, pars. 1702(g), (o));

(3) in January 1990, Buckellew filed a civil suit in circuit court against the District, alleging a violation of the School Code related to his mid-year reduction in hours and was represented by an attorney furnished by the Association;

(4) on two occasions in February 1990, the District, through Behm, had threatened Buckellew because of the protected activities described in (3) above;

(5) on February 8, 1990, Behm interrogated an employee regarding that employee's union and/or concerted protected activities, and told an employee that all part-time employees would be laid off and/or fired because Buckellew sought union and/or legal representation;

(6) on February 12, 1990, Behm recommended to the School Board that all part-time custodial-maintenance employees, including Buckellew, be dismissed at the end of the 1989-90 school year and, on March 5, 1990, the School Board approved this recommendation

because of the union and/or protected concerted activity of filing the lawsuit; and

(7) on March 12, 1990, the District notified these employees of their dismissal and, effective May 25, 1990, they were terminated and/or laid off because of the protected activity. The complaint alleged this conduct violated section 14(a)(1) of the Act by interfering with, restraining, or coercing employees in the exercise of their rights under the Act.

It also alleged that the District had discriminated against Buckellew and the other part-time employees in regard to hire, tenure, or employment (or any term or condition of employment) to encourage or discourage membership in any employee organization, in violation of section 14(a)(3) of the Act.

On July 12, 1990, the District posted notices of vacancies, including two cooks, three aides, and two elementary teachers. On July 25, 1990, the School Board approved the hiring, at one of the buildings, of a cook, a part-time custodian, and a server to help at lunch. The School Board also approved a job description for head cooks.

On August 27, 1990, the School Board approved its school year 1990-91 budget.

A hearing commenced on the IELRB complaints before a hearing officer on October 30, 1990.

### A. Behm Testimony

Former superintendent Behm testified that in 1987, at the time of the consolidation of the Ridge Farm and Georgetown school districts, and until September 1989, the Association only represented certified employees. In September 1989, an election was held for representation of noncertified employees. As representative of the District, he approved the election ballots and the list of people eligible to participate. As superintendent, he made recommendations to the School Board regarding programs and personnel which were generally followed.

No challenge was made by the District to any of the custodial-maintenance employees voting in the representation election. As to the issue of whether the custodians were temporary or substitute employees, Behm testified that Buckellew and the others reported to work fairly regularly during the 1988-89 school year. Some of them were working eight hours a day, five days a week. The hours for custodians were reduced by half because the project they had been working on was complete and there was not much work for

them to do. These employees were not eligible for health insurance benefits either before or after October 1989, so the only cost to the District was their salaries. Behm did not consult with the Association prior to reducing the hours of custodians. Bargaining with respect to the ESPs did not begin until January 1990. Behm testified that cafeteria employees working six hours per day were considered full-time employees and eligible for employer-paid health insurance. The benefits were worth an average of $300 per month to the employees.

Behm testified that by releasing the custodians, the District saved about $40,000 to $50,000. Approximately $10,000 was saved by cutting back the hours of the cafeteria employees. Behm did not participate in negotiating the ESP collective-bargaining agreement, so he did not know whether these cuts were discussed with the Association.

Spitz was a certified employee who worked as a tutor for a severely handicapped child during the 1989-90 school year. During this time, she was covered by the certified employees' contract and paid on the certified salary schedule. Behm testified that Spitz was basically functioning as an aide, despite the fact that she was a certified employee. The student subsequently began attending school on a part-time basis, and Spitz was only working with him on that basis. Behm recommended Spitz be terminated as a certified employee and that she be rehired as an aide. An aide's salary is less than 50% of a teacher's. She would have been expected to perform an aide's duties at an aide's pay. About $10,000 in savings would result from reclassifying Spitz to a noncertified position.

When certified employees have been subjected to a RIF, the District does not pay their health insurance premiums during the summer, even though they have recall rights.

Behm testified that custodians working full-time during the 1988-89 school year were assigned to the demolition of the old Ridge Farm high school and to the building of a bus garage in Georgetown. That project lasted about 18 months. Prior to that project, they were working four to five hours per day, depending upon what they were doing. After the project ended, some of them were working only four hours per day. There were seven buildings in the consolidated District that had custodial and maintenance work done during 1989-90 school year. When asked to distinguish between permanent or full-time employees and part-time or substitute employees, Behm testified that "permanent" employees are on the permanent payroll, which means they get paid every two weeks

and they have a written employment contract. "Temporary" or "substitute" employees did not have employment contracts in the 1988-89 school year and were paid every four weeks. Only "permanent employees" qualified for fringe benefits, such as District-paid insurance, sick leave days, paid vacation time, personal days, and paid holidays.

There were written policies between the District and all the health insurance carriers. Under the policies, terminated employees were not eligible to receive District-paid health insurance, although they could pay their own premiums and remain covered for up to 18 months under Federal law.

## B. *Buckellew Testimony*

Marvin Buckellew testified that he worked for the old Georgetown school district beginning about 1985. He was hired through Manpower and the Illinois Department of Public Aid. During the 1988-89 school year, he was working eight hours per day, performing routine maintenance duties. He performed the same type of work during the 1989-90 school year. He voted in the representation election in 1989. When he was verbally told his hours were to be reduced, he demanded to be notified in writing. His hours were cut to four hours per day, five days a week. He continued to work those hours until the end of the school year. After his lawsuit was filed, he had a conversation with Behm. Dave Niccum, his maintenance supervisor, was also present during the conversation, which took place at a maintenance building. Behm showed Buckellew the copy of his complaint and asked if he knew what that meant. Buckellew replied that he did. Behm told him the lawsuit would affect his work and that of other part-time workers also. Behm told him it would cause him to be terminated. The conversation lasted about 30 minutes. Behm seemed very angry and very discouraged. There was no mention by Behm of the economic situation of the District. Prior to this conversation, he had had no conversations with Behm about him losing his job.

Buckellew testified he made about $4.75 per hour during the 1989-90 school year. He did not have District-paid health insurance benefits, sick leave, or vacations. Since his termination by the District, he had not been offered reemployment by the District in any capacity.

Buckellew testified he was first added to the substitute list for custodians in 1984. He never had a written employment contract because he was considered "part-time" help. The project on the

Ridge Farm high school ended in October 1989. After that, Buckellew testified he continued to work full-time for several months. However, he was never placed on the list of "permanent" employees. After the Ridge Farm project, he helped with an addition to the maintenance building at Georgetown that took about six or seven months. A couple of months after that project ended, his hours were cut to four per day. Buckellew further testified that in his conversation with Behm, he was told that the lawsuit would cost him his job and he would never work in the District again.

## C. *Katavich Testimony*

Cindy Katavich testified that she had been employed by the District for the last year as head cook at the junior high school. Prior to that, she was a regular cook at another school in the District. She voted in the September 1989 representation election and served on the Association's negotiating team. During negotiation on the ESP's contract in January and February 1990, there was no discussion or proposal by the District to eliminate, for financial reasons, (1) two cooks, (2) any aide positions, or (3) a clerical position. There was likewise no discussion or proposal from the District as to (4) the elimination or reduction of part-time maintenance employees for economic reasons, or (5) a reduction in the hours of cafeteria employees from six hours to five hours per day. All these changes involved ESP positions. There was absolutely no mention of reduction of hours or elimination of any ESP positions.

Katavich testified that it was now much harder to get the work done in the cafeterias because of the one-hour reduction, as employees had to do the same amount of work in less time. There had been no reduction in their work load. After the School Board approved the changes detailed above, there was no bargaining between the District and the Association regarding this.

After the cuts were made by the District, the Association's negotiating team proposed that 25-hour-per-week cooks be considered full-time employees in order that their health insurance benefits would not be lost.

## D. *Howard Testimony*

Nancy Howard testified that she was (and had been at all times relevant to this case) president of the Association. She was employed by the District as a teacher for the learning disabled and a bus driver, and she was a certified employee. When the hours of custodians were reduced in October 1989, Buckellew complained to

her and she referred him to the IEA-NEA Region 8 UniServ Director. Custodian hours were reduced after the representation election, but before any collective-bargaining agreement had been entered into with respect to the ESPs. In February 1990, she had a telephone conversation with Behm about Buckellew's lawsuit. Behm complained to her that the lawsuit would cost the District money for its lawyer, while Buckellew's lawyer was free. Behm also mentioned that he had originally hired Buckellew, knowing that he was illiterate, and now Buckellew was "kicking them in the ass." Behm then told her that he would have to recommend to the School Board at its next meeting that all part-time personnel be dismissed.

Howard testified that she was never notified by the School Board that it was not adopting Behm's rationale for dismissing the part-time custodians. In her 18 years' experience at Georgetown and in the consolidated District, an entire classification of employees had never been subjected to a RIF. The Association felt that certified employees who were laid off should have had their insurance premiums paid through the summer, because they had recall rights for one year and it would not be known until the end of summer whether they would be recalled. There was no bargaining regarding the insurance matter—the District unilaterally made that decision. Neither she nor anyone on the Association's bargaining team was consulted. As Association president, she was never consulted by the District as to the elimination of all part-time custodians or the reduction in work hours for the cooks, the change in Bernadine Spitz' classification from certified to noncertified, or any of the other changes involving the ESPs.

Howard testified that the Association received a copy of every School Board's proposed meeting agenda in advance and was listed on the agenda for the purpose of speaking to any item thereon. The Association received minutes of School Board meetings. She recalled a meeting of the School Board in August 1989 dealing with a large financial deficit. She was also aware of a request by the School Board in January 1990 for an independent audit by the Illinois State Board of Education (State Board). She was aware of a deficit figure of $600,000 to $720,000 as of January 1990. She recalled a report by the School Board's auditor in late January 1990 citing the need to reduce expenditures by $505,000. She recalled the School Board's stated intention to consider a reduction of five or more teachers and set a date for public hearing. She was also at the meeting where a public advisory committee was appointed by the School Board. She attended the meeting on March 5, 1990,

where the School Board made personnel cuts. The Association, as well as the public advisory committee, made recommendations to the School Board for savings to avoid cutting personnel.

Howard testified that she made a request to the District to negotiate the impact of the proposed cuts and reductions. *Impact bargaining was conducted,* but she was not part of that. This bargaining occurred after the cuts had been made on ESP positions. The District did not rescind those cuts prior to bargaining.

### E. *Conklin Testimony*

George Conklin testified that he was president of the School Board. In January 1989, the State Board placed the District on its watch list for financial problems. In April 1989, he recommended that the School Board consider cutting personnel. The Association was on the agenda of every School Board meeting and it received a copy of the minutes of every School Board meeting and every annual budget. In May 1989, the salaries for all noncertified personnel were frozen. This was done at a public School Board meeting. In July 1989, Behm told the School Board it would be impossible to get through the 1989-90 school year without issuing teachers' orders for the payroll. The District obtained a $1.1 million loan from a Chicago bank and then issued bonds to repay the loan. In August 1989, the School Board's auditor reported that expenditures would have to be decreased by $505,000. There were some personnel resignations and those positions were not filled. In January 1990, the superintendent recommended that the School Board have a hearing in February to dismiss five or more teachers. Personnel cuts were made at the February and March meetings. The collective-bargaining agreement required the School Board to notify the Association of District financial problems, and this was done. The majority of suggestions from the advisory committee and from the Association did not appear feasible. At the meeting on March 5, 1990, the School Board, in addition to cutting personnel, closed Frazier School and made plans to close the old Ridge Farm grade school or sell it.

Conklin testified the School Board did receive a request from the Association in April 1990 to negotiate as to the impact of reductions on its members. That session was held on May 3, 1990, prior to the regular bargaining session for the contract. The Association representatives at the impact-bargaining session requested additional information on what cuts the School Board was making. The School Board's team felt the Association had already received this information through School Board meeting minutes and agendas. The Associ-

ation asked about the effect of custodial cuts, and the School Board's team said efficiency would have to be increased and that some custodians would probably have to work overtime. As to the cut in the hours for cooks, efficiency was discussed and some of the extra things done for students by the cooks would have to be sacrificed.

Conklin testified that Behm's rationale for dismissing the custodians had no influence on him personally. The School Board did discuss Behm's statement, however. It did not publicly disavow Behm's rationale. His vote would have been the same with respect to the custodians had there been no lawsuit filed. Elimination of all part-time employees had been discussed as far back as November 1989, when a retiring custodian was not replaced. However, he could not recall anything on that issue being placed in the minutes of that meeting.

Conklin also testified there was no bargaining session on the issue of health insurance for the employees subjected to the RIF even though the Association requested one. There was no bargaining before the decision was made to stop paying health insurance premiums for those employees. Prior to the February 26, 1990, School Board meeting where cutting the cooks' hours was first discussed, the School Board's team had mentioned in its negotiating sessions with the Association that cuts in personnel would have to be made unilaterally. The proposed cuts were not made in the form of written proposals, and he could not recall the dates of those sessions. He did not remember any response from the Association to those comments.

Conklin testified that Frazier School was reopened for the 1990-91 school year. At the time the District was contemplating changes in the ESPs, it was bargaining with the Association regarding conditions of employment for them. The Association insisted on completing the 1989-90 school year contract prior to negotiating the one for the 1990-91 school year, in order to establish conditions of employment. The District offered no contract proposals regarding any of the cuts made in ESP hours and personnel. Generally, in a RIF, the first people to be affected are part-time people, then full-time, in order of seniority. That was the practice followed in the present case.

### F. Delmotte Testimony

Robert Delmotte was the District's current superintendent. He testified that during the 1989-90 school year he was the high school principal and assistant superintendent. In July 1989, Behm resigned as superintendent, effective at the end of the 1989-90 school year. Delmotte was appointed, in August 1989, to succeed Behm for the 1990-91 school year. He worked closely with Behm during the 1989-

90 school year. He participated in the ESP contract negotiations in the 1989-90 school year. During the 1990-91 school year, the District employed "part-time" custodians who worked four hours per day. It also employed "full-time" custodians. Prior to March 5, 1990, the District did not submit any written proposals related to ESP employees who could be subjected to a RIF, reducing hours for cooks, changing certified employees to noncertified aides, extra work days for the library clerks, or the impact of the ESP reductions on those employees' health insurance. The District had rehired some of the former "part-time" custodians subjected to the RIF at the end of the 1989-90 school year. The District had not hired anyone who was not working for the District in the 1989-90 school year for these positions. A number of certified staff subjected to the RIF had been recalled to their former positions. All the aides, clerical employees, and cooks subjected to the RIF had been recalled.

Delmotte testified that Spitz was a certified teacher in home economics. She was given the required notice of the end of her aide job. She was not qualified to hold another certified position in the District. She was offered reassignment as an aide, but declined the position. Even under the first collective-bargaining agreement, part-time ESPs did not accrue seniority. The reason for recalls of people subjected to the RIF was that the District was to receive approximately $215,000 in additional State-aid money. Frazier School was reopened, and an additional first-grade and second-grade class were added because the student population enrolled for those grade levels otherwise exceeded the permissible class sizes under the collective-bargaining agreement.

Delmotte also testified that Frazier School never actually closed during the 1989-90 school year. At the March 5, 1990, School Board meeting, all part-time employees were subjected to the RIF—not just custodians.

## G. *Rhodes Testimony*

Esther Rhodes, when recalled to testify, said she had participated in the negotiation for the 1989-90 school year ESP contract on behalf of the Association. She did not recall any discussion during bargaining sessions about cuts in ESP personnel. There was no discussion during certified employee negotiations of health insurance for certified employees subjected to the RIF. The items on the bargaining table for ESPs pertained to their working conditions and salaries, such as job descriptions, seniority, holiday pay, and insurance.

When the impact-bargaining session was held, the Association negotiating team felt it needed more information regarding the rationale

for the cuts. They asked for information on the kind of work the cooks and custodians would not be doing after the cuts and how the work year for library clerks would be handled. Behm told them the cooks were lazy and that they could get the work done, and that the custodians would have to organize their work better. They were told the Association was the cause of the library clerks' work year being extended, because the certified contract provision required the library to be open the entire school year. The Association did not feel this was sufficient information to allow it to formulate intelligent proposals.

Rhodes also testified that in the ESP bargaining prior to the announced ESP cuts on March 5, 1990, the District did not present any documentation on the need for cuts. The only talk of this was at School Board meetings. The District never presented anything to the Association as to the cost savings of cuts and changes, other than what was presented in the School Board meetings. To her knowledge, there had never before been any teachers subjected to a RIF not receiving employer-paid health insurance during the summer.

As to her statement that the District had not provided notification on the proposed cuts, Rhodes testified that getting information through School Board meeting minutes was not how negotiations had ever been handled before. The School Board agenda was not necessarily evidence of what would be done. The Association tried to have a representative attend every School Board meeting. Even though the Association had a standing place on the School Board's agenda, a public meeting was not the place to conduct negotiations. She was aware that the District had been placed on the State's financial watch list and had heard the various deficit figures. The Association was very interested in the financial condition of the District. Rhodes conceded that the ESP collective-bargaining contracts stated that part-time personnel did not attain seniority; however, the ESPs were subjected to the RIF *prior to the ratification* of either of the collective-bargaining contracts.

Rhodes said she did not recall that alternatives to cutting personnel were discussed in negotiating sessions prior to March 12, 1990. She denied that cutting the hours for cooks from six to five hours per day was discussed in any negotiating session prior to March 12, 1990. They had discussed establishing the requirements for a full-time cook, which was 30 hours per week.

Rhodes testified that the first time the Association heard the District was making ESP employee cuts was at the March 5, 1990, School Board meeting. Prior to that, the issue of the definition of

"part-time" employment versus "permanent" or "temporary" employment with respect to the ESPs was on the bargaining table. These distinctions are determinative of, for instance, whether employees would qualify for health insurance and seniority rights. Paragraph 2.11A of the 1990-91 school year contract called for Association notification (in confidence), in advance, when the District found it necessary to reduce staff (meaning certified staff). This provision of the contract has been a part of all prior contracts negotiated for the District. The Association received notice through the School Board agenda, about four to five days in advance of the February 27, 1990, School Board meeting, that staff reductions would be discussed during that meeting. The Association's executive committee had only that time to put together alternatives to those reductions for the School Board's review.

### H. *Behm Testimony*

Derry Behm testified for the District that the arrangement on Buckellew reached between the District and the Illinois Department of Public Aid (Department) in 1984 had been for him to work either four hours per day for 90 continuous days or eight hours per day for two weeks—then be off two weeks, alternating that way for the 90-day period. He had initially been assigned to maintenance training. After that, the Department was to place Buckellew in a different training assignment with the District. Buckellew continued working for the District in this program from 1984 through 1986. After the program lapsed, he had been put on the "substitute" list. During the year prior to consolidation (termed the "acceleration" year), Buckellew started working almost full-time. This lasted about two years. After that, there was not as much work and, in October 1989, Buckellew was reduced to four hours per day. All other "substitute" custodians who had been assigned special jobs during the acceleration year and the first year after consolidation were also cut back. In the spring of 1988, Buckellew had taken two rolls of carpeting from Ridge Farm high school and put them in his trailer. To avoid arrest, Buckellew had agreed to pay for the carpet by payroll deductions. In April 1990, Buckellew had taken another employee's coat. Behm required him to return the coat, and no action had been taken against Buckellew for the theft. This last incident was after Buckellew had filed his lawsuit, and Behm was concerned that any action taken would be interpreted as an unfair labor practice.

With respect to the conversation with Buckellew about his lawsuit, Behm testified that Buckellew admitted to him that he was not a

"full-time" custodian, but that he believed he should have been hired for one of four open "full-time" positions filled while he worked for the District. Behm said he pointed out to Buckellew that those hired had more skills than he did. Buckellew also admitted he had told his attorney that he had been a "full-time" employee since 1985, a fact alleged in the complaint. Behm admitted he was upset with Buckellew. He feared action on the part of the other custodians who had been cut back, and he was concerned about expense to the District. Behm admitted he had become very angry with Buckellew and told him that, if he had his way, he would fire him that day. Behm also admitted venting his frustration with Association president Howard a few days later.

Prior to Behm's recommendation to the School Board to dismiss all part-time custodians, the School Board had determined by consensus (but not by vote) that all part-time employees would have to be subjected to a RIF. This went back to November 1989, when a full-time custodian resigned and was not replaced. Earlier in 1989, an assistant mechanic, a teacher's aide, and a secretary were not replaced when their positions came open. This was all in anticipation of necessary massive cuts because of severe financial problems of the District. The District's money problems went back to the first year after consolidation, when it received less money from the State than the year before. The District also had a shrinking tax base and increased expenses for teacher raises and health insurance premiums.

Behm also testified that the District's financial woes were highly publicized at School Board meetings and through media coverage. The District borrowed to its capacity in 1988 and needed to borrow additional money in 1989. The Association was placed on the agenda of the February 26, 1990, School Board meeting to present its recommendations on cost-saving measures. An advisory committee was also appointed to advise on such measures.

Behm testified that at the May 3, 1990, impact-bargaining session requested by the Association, he did not say the cooks were lazy. He stated he did not believe they worked a full six-hour day anyway. His response to the questions about the dismissed custodians was that with three less buildings to maintain, the District did not need part-time custodians. Insurance for the cooks was discussed. Behm said he stated the insurance policies required employees to work 30 hours per week to be covered and that he felt once the certified staff was subjected to the RIF, they were no longer employees and the District should not have to pay their health insurance during the summer.

Behm testified that although Spitz was certified to teach home economics, she never taught this subject in the District. The medical condition of the child whom Spitz was tutoring eventually deteriorated to the point where he left school. At that point, Spitz was terminated as a certified teacher and reclassified as a personal aide (at an aide's salary) if she wished to return to work.

On cross-examination, Behm testified that he was very serious and very upset during his conversation with Buckellew. He also thought Buckellew was not as grateful as he should have been for the things Behm and others in the District had done for him. It had been District policy, even with ESP employees, to reduce part-time employees before full-time. However, Behm admitted that, in reducing the cooks' hours, the School Board made full-time employees into part-time ones. The School Board discussions in November 1989, relative to having to reduce part-time employees in the future, took place in a public School Board meeting and not in a negotiating session with the Association. Behm claimed he told the School Board at the meeting that all part-time custodians would have to be released if buildings were closed as part of the cuts necessary in the future. Counsel for the Association pointed out, and Behm agreed, that nowhere in School Board meeting minutes between November 13, 1989, and February 12, 1990, were any specific references made to the elimination of all part-time custodial employees.

## II. HEARING OFFICER'S DECISION

On March 21, 1991, the hearing officer issued his recommended decision and order. *Georgetown-Ridge Farm Community Unit School District 4*, 7 Pub. Employee Rep. (Ill.) par. 1045, Nos. 90—CA—0047—S, 90—CA—0048—S (Illinois Educational Labor Relations Board, hearing officer's recommended decision and order, Mar. 21, 1991) (hereinafter 7 Pub. Employee Rep. (Ill.) par. 1045).

### A. *Findings and Conclusions*

In the decision, the hearing officer stated he did not find credible Behm's testimony, that the School Board had reached a consensus in November 1989 to dismiss part-time custodians for economic reasons. He pointed out that four days after the end of the 1989-90 school year, the District hired six of nine former part-time custodians back as "temporary" employees for the 1990-91 school year. In addition, a "full-time" custodian worked additional part-time hours at one of the schools. An additional "part-time" custodian was hired, and the main-

tenance supervisor performed some custodial work. 7 Pub. Employee Rep. (Ill.) par. 1045, at IX-187.

He also found that the Association was not provided notice prior to March 5, 1990, of the District's intention to reduce ESPs, other than Behm's statements to the School Board that "part-time" custodians should be reduced due to Buckellew's lawsuit. (7 Pub. Employee Rep. (Ill.) par. 1045, at IX-186.) In addition, the District had not raised any proposals regarding the possibility of reducing ESPs at the bargaining sessions being held concerning those employees. (7 Pub. Employee Rep. (Ill.) par. 1045, at IX-189.) He found that the District had reclassified Spitz' position from that of a certified employee to a noncertified personal aide, without prior notice to or bargaining with the Association. 7 Pub. Employee Rep. (Ill.) par. 1045, at IX-190.

With respect to the issue of termination of health insurance benefits, the hearing officer found that the certified employees' collective-bargaining agreement for the 1989-90 school year contained provisions governing reinstatement rights for laid-off certified employees and certified employees' health insurance benefits. The collective-bargaining agreement was silent as to continuation of health insurance premium payments for certified employees who had been laid off due to a RIF. The agreement did not contain a clause waiving additional bargaining on issues that might arise during the duration of the contract. The Association requested bargaining concerning the continued payment of health insurance for employees who would be laid off, but no bargaining took place concerning this issue. 7 Pub. Employee Rep. (Ill.) par. 1045, at IX-190.

The hearing officer also found from the evidence that the District had a budget surplus at the beginning of the 1990-91 school year. 7 Pub. Employee Rep. (Ill.) par. 1045, at IX-185.

The hearing officer concluded, as to the firing of Buckellew and the other custodians, that the Association had established a *prima facie* case of discriminatory discharge and that the District had not shown it acted for legitimate reasons. (7 Pub. Employee Rep. (Ill.) par. 1045, at IX-187.) Even were he to accept the District's view of Behm's actions, the hearing officer would still find that Behm's comments and recommendation demonstrate an intention to strike out at Buckellew and the other part-time custodians because Buckellew had sought Association assistance when his hours were reduced. In the hearing officer's view, it was immaterial whether Buckellew and the others were "substitute" or "temporary" employees. They were "educational employees" under the Act, and they were bargaining unit

members. (7 Pub. Employee Rep. (Ill.) par. 1045, at IX-186.) The hearing officer rejected the District's arguments that custodians would have been laid off anyway because of financial problems. The District did not present evidence of the decision-making process leading to dismissal of the custodians. Allegations of financial problems without a more detailed explanation did not establish a defense to unlawful discharge. Further, the District called most of the custodians back to work for the 1990-91 school year, although not in their former or equivalent positions. Thus, the District still utilized part-time custodians. The District failed to explain why Buckellew was not offered one of these positions. The hearing officer found that discharge of these employees violated section 14(a)(3) of the Act. 7 Pub. Employee Rep. (Ill.) par. 1045, at IX-187.

The hearing officer also found that Behm's conversation with Association president Howard was an independent violation of section 14(a)(1) of the Act, and that a reasonable employee would conclude from Behm's remarks that if employees pursued their rights in a way which the District disapproved, retaliatory action would ensue. This would have the effect of "chilling" employees in the free exercise of their rights under section 3 of the Act (Ill. Rev. Stat. 1989, ch. 48, par. 1703). 7 Pub. Employee Rep. (Ill.) par. 1045, at IX-188.

The hearing officer found a violation of section 14(a)(5) of the Act in the unilateral dismissal, without bargaining to impasse, of two cooks, four aides, and one clerical employee. (7 Pub. Employee Rep. (Ill.) par. 1045, at IX-189.) He pointed out that the IELRB has held that during the pendency of contract negotiations, an educational employer must maintain the status quo as to mandatory subjects of bargaining, such as terms and conditions of employment, until the parties have reached impasse or executed an agreement. An educational employer's unilateral change with respect to a mandatory subject of bargaining constitutes a *per se* violation of the duty to bargain, without regard to consideration for good or bad faith. (7 Pub. Employee Rep. (Ill.) par. 1045, at IX-188.) The hearing officer rejected the District's argument that a RIF of its noncertified employees was not a mandatory subject of bargaining under section 4 of the Act (Ill. Rev. Stat. 1989, ch. 48, par. 1704). Since the decision to subject employees to a RIF directly affects issues of wages, hours, and terms and conditions of employment, it is a mandatory subject of bargaining. (7 Pub. Employee Rep. (Ill.) par. 1045, at IX-188.) The Association's failure to demand bargaining prior to dismissal did not excuse the District's action. The Association was entitled to have sufficient notice of contemplated changes, to give it an opportunity to make a

meaningful response. By denying the Association a meaningful opportunity to bargain over the RIF decision, the District breached its duty to bargain in good faith. 7 Pub. Employee Rep. (Ill.) par. 1045, at IX-189.

The hearing officer made the same findings regarding the reduction in hours for cooks, which he found directly affected their wages, benefits, and work loads. These are mandatory subjects of bargaining. 7 Pub. Employee Rep. (Ill.) par. 1045, at IX-189.

With respect to the change in hours for library clerks, the hearing officer noted there was no dispute that the certified collective-bargaining agreement (which mandated the libraries stay open the entire school year) did not cover the clerks, who are ESPs. Since the parties had agreed that noncertified issues would not be addressed during negotiation on certified issues, the District's unilateral change in the clerks' schedules was not excused by the earlier negotiations. The hearing officer found that the District violated section 14(a)(1) of the Act when it declined the Association's bargaining demand concerning the clerks. Unilaterally making extra days voluntary for the clerks merely further undercut the Association's position as exclusive representative of the clerks. 7 Pub. Employee Rep. (Ill.) par. 1045, at IX-189.

As to Spitz, the hearing officer found she was not merely laid off due to the RIF. The very same certified work was then reclassified to a noncertified position, with the same duties at half the pay. The IELRB has held that parties are required to engage in mid-term bargaining over mandatory subjects of bargaining which were neither fully negotiated nor the subject of a clause in an existing collective-bargaining agreement. The collective-bargaining agreement in this case did not contain a provision covering the reclassification of positions, and there was no waiver of mid-term bargaining. Thus, the District made an unlawful unilateral change in violation of sections 14(a)(1) and (a)(5) of the Act (Ill. Rev. Stat. 1989, ch. 48, pars. 1714(a)(1), (a)(5)). 7 Pub. Employee Rep. (Ill.) par. 1045, at IX-190.

On the issue of termination of District-paid health benefits for employees subjected to the RIF, the hearing officer held the District violated sections 14(a)(1) and (a)(5) of the Act. An employer must maintain the status quo with respect to terms and conditions of employment during a contractual hiatus or during negotiation for a contract. Such terms and conditions of employment must be an established practice to constitute the status quo. The test is whether the status quo would have been clearly apparent to an objectively reasonable employer at the time in question. The hearing officer found that

the Association did not show that continuation of employer-paid benefits for employees subjected to a RIF was an established practice. The evidence showed employees subjected to a RIF had previously been allowed to continue such benefits by paying their own premiums. Thus, the District's refusal to continue paying the premiums did not constitute a unilateral change in wages, hours, and other terms and conditions of employment. However, the Association did make a request to bargain over this issue, a request which was refused by the District. There was no clause covering this issue in the certified contract, and the noncertified employees were not yet covered by a contract when the District terminated benefits. Thus, the District was obligated to bargain with the Association, upon request, concerning the continuation of health-care premiums for employees who might be subjected to the RIF. 7 Pub. Employee Rep. (Ill.) par. 1045, at IX-190.

### B. *Hearing Officer's Order*

The hearing officer ordered the District to do the following:

(1) cease and desist from (a) interfering, restraining, or coercing employees in the exercise of the rights guaranteed under the Act; (b) discriminating in regard to hire, tenure of employment, or any term or condition of employment to discourage membership in the Association; (c) refusing to bargain collectively in good faith with the Association; and (d) threatening or interrogating employees who engage in activity protected by the Act; and

(2) take the following affirmative actions to effectuate the policies of the Act: (a) immediately reinstate all the dismissed part-time custodians to the same or substantially similar positions as they last held, making them whole for any lost wages, benefits, and interest lost due to the District's unfair labor practice; (b) make Spitz whole for any losses incurred due to the unilateral reclassification of her certified position to a noncertified position; (c) make cafeteria workers whole for any losses incurred due to the unilateral reduction of hours for cooks; (d) make the aides, cooks, and clerical workers whole for any losses incurred when the District unilaterally imposed a RIF; (e) make library clerks whole for any losses incurred by the unilateral change in the length of their work year; (f) rescind the unilateral changes and restore the status quo by (1) reclassifying Spitz' job from a noncertified position to certified status and rehiring her; (2) restoring cooks to a work schedule of six hours each day; (3) reinstating the aides, cooks, and clerical workers subjected to the RIF to the same or substantially similar positions; and (4) restoring the

length of the library year; (g) bargain in good faith with the Association concerning reductions in employee hours, reclassification of unit positions for economic reasons, length of work year, and payment of health benefits for workers subjected to a RIF; (h) post a notice in school buildings, essentially stating that the District will not violate the Act; and (i) notify the IELRB within a certain time period of the steps taken to implement the decision. 7 Pub. Employee Rep. (Ill.) par. 1045, at IX-191.

The District filed exceptions to the hearing officer's recommended decision and order.

### III. IELRB Ruling

In its opinion and order issued October 2, 1991, the IELRB affirmed the hearing officer's recommended decision. (*Georgetown-Ridge Farm Community Unit School District 4*, 7 Pub. Employee Rep. (Ill.) par. 1106, Nos. 90—CA—0047—S, 90—CA—0048—S (Illinois Educational Labor Relations Board, Oct. 2, 1991) (hereinafter 7 Pub. Employee Rep. (Ill.) par. 1106).) It adopted the hearing officer's findings of fact and his credibility resolutions. In its order, the IELRB made some of its own findings and conclusions on some of the issues.

On the issue of the status of part-time custodial employees, the IELRB noted that it was not convinced these employees were merely substitutes. Whether an employee is a short-term employee excluded from coverage under the Act does not depend on whether he is classified as a substitute, but whether he has a commitment of continued employment during the school year. The disputed custodial employees worked on a regular basis. When their actual responsibilities were considered, the IELRB concluded it was evident they were not short-term employees. Since they are educational employees under the Act, the District could not dismiss them for reasons prohibited under the Act, whether they were considered "substitute" or "permanent" employees. 7 Pub. Employee Rep. (Ill.) par. 1106, at IX-422.

With respect to the firing of custodial employees, the IELRB concluded that the District's alleged economic motivation for the dismissal was merely a pretext. The District's alleged financial difficulties had not been shown to be a significant reason for its action. Even if the District had established that economic reasons were a significant basis for the action, thus rendering this a dual-motive case, the IELRB would still have found that the District violated the Act. There was clear evidence of anti-union motivation, which the School Board never disavowed. The dismissal took place only after Buckellew's lawsuit had been filed. Prior to that, Behm had taken

the position that "part-time" employees could perform the work of a "full-time" custodian who had resigned. 7 Pub. Employee Rep. (Ill.) par. 1106, at IX-423.

The IELRB concluded that the RIF was a mandatory subject of bargaining. (7 Pub. Employee Rep. (Ill.) par. 1106, at IX-423.) The District's RIF clearly involved the employees' wages, hours, and conditions of employment. The effect on them was profound. Because the reduction was economically motivated, the benefits of bargaining would have outweighed the burdens. It would have given the Association the chance to offer cost-saving alternatives, thus satisfying the District's financial concerns and the policy favoring collective bargaining. There was no bargaining on the issue of termination of non-certified personnel. The fact that the District consulted with the Association over reductions in the teaching staff is no substitute for bargaining over the specific action affecting the noncertified staff, nor does impact bargaining substitute for bargaining over the decision itself. 7 Pub. Employee Rep. (Ill.) par. 1106, at IX-424.

The IELRB also concluded the reclassification of Spitz was not a *bona fide* restructuring, because she would be doing the same work for a lower salary. The only managerial interest was budgetary. Spitz' interest outweighed the District's interest. The same analysis applies here as with the RIF of noncertified staff. The reclassification was a mandatory subject of bargaining. There was no bargaining, and the Association did not waive its right to demand bargaining. The Association was not notified in advance of the specific decision to reclassify, but only of the District's general economic problems. 7 Pub. Employee Rep. (Ill.) par. 1106, at IX-424 through IX-425.

As to the library clerks, while the decision to keep the libraries open longer might have been a managerial decision affecting the standard of services, the District could not implement that decision in a way that unilaterally changed the hours of library clerks. Any managerial concerns were outweighed by the impact on the clerks. The fact that the District made the extra days voluntary demonstrated that alternatives could have been explored in bargaining. 7 Pub. Employee Rep. (Ill.) par. 1106, at IX-425.

The IELRB adopted the hearing officer's requirements as to actions the District was ordered to take to remedy the violations. 7 Pub. Employee Rep. (Ill.) par. 1106, at IX-425 through IX-426.

IV. DISTRICT PETITION FOR REVIEW

The District filed its petition in this court for review of the

IELRB order on October 28, 1991, as to the following actions required of the District:

(1) reinstate the custodians and make them whole for losses suffered;

(2) rescind the unilateral RIF, reinstate the aides, cooks, and clerical workers and make them whole for losses suffered;

(3) rescind the reduction in hours for the cooks, restore their former work hours, and make them whole for losses suffered;

(4) rescind the reclassification of Spitz' position, offer to rehire her as a certified employee, and make her whole for losses suffered;

(5) rescind the change in the hours for library clerks; and

(6) bargain in good faith with the Association concerning RIF's, reductions in employee hours, reclassification of unit positions for economic reasons, length of work year, and payment of health insurance premiums for laid-off workers.

## V. ANALYSIS

### A. *Whether the Actions Taken by the District in Reduction of Employee Hours, Increase in Hours, Elimination of Health Insurance Benefits, Reclassification of a Certified Position as a Noncertified Position, and Dismissal from Employment are Mandatory Subjects of Bargaining in this Case*

The following portions of the Act are relevant to this case. "Educational employee" is defined as:

> "(b) 'Educational employee' or 'employee' means any individual, *excluding* supervisors, managerial, confidential, *short term employees*, student, and part-time academic employees of community colleges employed full or part time by an educational employer." (Emphasis added.) (Ill. Rev. Stat. 1989, ch. 48, par. 1702(b).)

"Employer rights" are provided for as follows:

> "Employers shall not be required to bargain over matters of inherent managerial policy, which shall include such areas of discretion or policy as the functions of the employer, standards of services, its overall budget, the organizational structure and selection of new employees and direction of employees. *Employers, however, shall be required to bargain collectively with regard to policy matters directly affecting wages, hours and terms and conditions of employment as well as the impact*

*thereon upon request by employee representatives.*" (Emphasis added.) (Ill. Rev. Stat. 1989, ch. 48, par. 1704.)

Section 10(a) of the Act states the following on the "duty to bargain":

"(a) An educational employer and the exclusive representative have the authority and the duty to bargain collectively as set forth in this Section. Collective bargaining is the performance of the mutual obligations of the educational employer and the representative of the educational employees to meet at reasonable times and confer in good faith with respect to wages, hours and other terms and conditions of employment, and to execute a written contract incorporating any agreement reached by such obligation, provided such obligation does not compel either party to agree to a proposal or require the making of a concession." (Ill. Rev. Stat. 1989, ch. 48, par. 1710(a).)

The Act provides the following are unfair labor practices:

"(a) Educational employers, their agents or representatives are prohibited from:

(1) Interfering, restraining or coercing employees in the exercise of the rights guaranteed under this Act.
\* \* \*

(3) Discriminating in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any employee organization.
\* \* \*

(5) Refusing to bargain collectively in good faith with an employee representative which is the exclusive representative of employees in an appropriate unit." Ill. Rev. Stat. 1989, ch. 48, pars. 1714(a)(1), (a)(3), (a)(5).

We are remanding this matter to the IELRB, for application of the balancing test as set forth in *Central City Education Association v. Illinois Educational Labor Relations Board* (1992), 149 Ill. 2d 496, 599 N.E.2d 892 (LeRoy Community Unit School District No. 2, appellee).

■■ ■ Our court's decision in *Board of Education, LeRoy Community Unit School District No. 2 v. Illinois Educational Labor Relations Board* (1990), 199 Ill. App. 3d 347, 556 N.E.2d 857, established a balancing test to be used when an inherent managerial policy exists (see section 4 of the Act (Ill. Rev. Stat. 1989, ch. 48, par. 1704)) and there is also an impact upon terms and conditions of employment (see Ill. Rev. Stat. 1989, ch. 48, par. 1710). The *LeRoy* test was stated as follows:

"If the management policy has a direct effect on the work force, the agency must balance the interests of management with the interests of the work force. Its determination of whose interests are more at risk is a question of law." (*LeRoy*, 199 Ill. App. 3d at 360, 556 N.E.2d at 866.)

In reversing *LeRoy*, the *Central City* court stated:

"The first part of the test requires a determination of whether the matter is one of wages, hours and terms and conditions of employment. This is a question that the IELRB is uniquely qualified to answer, given its experience and understanding of bargaining in education labor relations. If the answer to this question is no, the inquiry ends and the employer is under no duty to bargain.

If the answer to the first question is yes, then the second question is asked: Is the matter also one of inherent managerial authority? If the answer to the second question is no, then the analysis stops and the matter is a mandatory subject of bargaining. If the answer is yes, then the hybrid situation discussed in section 4 exists: the matter is within the inherent managerial authority of the employer and it also affects wages, hours and terms and conditions of employment.

At this point in the analysis, the IELRB should *balance the benefits that bargaining will have on the decisionmaking [sic] process with the burdens that bargaining imposes on the employer's authority*. Which issues are mandatory, and which are not, will be very fact-specific questions, which the IELRB is eminently qualified to resolve.

District 133 argues that a balancing test such as this raises the specter of year-round bargaining, which would be a practical nightmare for school boards. This concern is valid, but it does not affect the essential nature of the test that the IELRB should apply. When the IELRB balances the benefits and the burdens in a given case, the practicality of the situation is an important factor for it to consider. However, it should be noted that meaningful negotiations do not necessarily have to be long and drawn out. The circumstances surrounding a specific case, including the timing, are part of the subjective criteria examined in determining if bargaining has been in good faith, as well as what type of bargaining is required in a given situation." *Central City*, 149 Ill. 2d at 523-24, 599 N.E.2d at 905.

The supreme court in *Central City* also stated:

"In the instant cases, the IELRB did not use the three-part test just stated in analyzing the issue of mandatory-bargaining subjects. Thus the causes must be remanded. The IELRB may additionally wish to make a more detailed inquiry into the bargaining practices and experiences concerning teacher evaluation plans and RIF decisions in other school districts in order to determine whether these issues are amenable to fruitful bargaining. Because the application of the test requires a detailed factual analysis that the IELRB is particularly well suited to examine, we remand these causes to the IELRB for further proceedings consistent with this decision." (*Central City*, 149 Ill. 2d at 524, 599 N.E.2d at 905.)

We are also compelled to remand to the IELRB, in light of the supreme court's suggestion of a "more detailed inquiry *** to determine whether these issues are amenable to fruitful bargaining." *Central City*, 149 Ill. 2d at 524, 599 N.E.2d at 905.

We emphasize the supreme court's statement that the IELRB is "uniquely qualified to answer, given its experience and understanding of bargaining in education labor relations" (*Central City*, 149 Ill. 2d at 523, 599 N.E.2d at 905), whether a matter is one of wages, hours and working conditions; and the statement "[w]hich issues are mandatory, and which are not, will be very fact-specific questions, which the IELRB is eminently qualified to resolve" (*Central City*, 149 Ill. 2d at 523, 599 N.E.2d at 905). School administrators and school labor law attorneys should keep those words in mind when considering whether bargaining is necessary. However, we will review other issues which do not evolve from conflict under sections 4 and 10 of the Act (Ill. Rev. Stat. 1989, ch. 48, pars. 1404, 1410).

We disagree with any suggestion by the hearing officer or the IELRB that the District was not facing financial problems. The hearing officer's finding of a *budget* surplus at the beginning of the 1990-91 school year is insignificant, when stacked against the previous 1989-90 school year $1.1 million loan which was successfully transferred to a bond indebtedness. The reality that this District (which contains a large agricultural base) has lost assessed valuation is not fiction, in light of section 20(e) of the Revenue Act of 1939 (Ill. Rev. Stat. 1989, ch. 120, par. 501(e)). If the decision of the IELRB had been based on the premise of the District being adequately funded, we would reverse. We find that it was not so based.

We are well aware of the burden placed on school districts because of decreasing assessed valuations of agricultural land resulting from legislative action, reduced funding by State government, and

the difficult task of obtaining increased district tax rates. Expenses must often be reduced and these reductions, while involving inherent managerial policy, most often directly affect wages, hours, and terms and conditions of employment. Attorney fees and costs related to litigation can have a profound effect on the education budget. Regardless of these factors, the Act cannot be ignored.

B. *Whether the District in Fact Engaged in Collective Bargaining with the Association Over the RIF Decisions*

While arguing that it was not required to engage in mandatory bargaining over the RIF decisions, the District claims it did in fact bargain with the Association. It argues the District's financial plight was well known and discussed in monthly school board meetings prior to the actual RIF decisions. It points out that pursuant to section 2.11A of the collective-bargaining agreement, it did consult with the Association executive committee about the proposed cuts. The Association had a standing place on the agenda of every School Board meeting to raise any subject it wished to discuss. The District emphasizes that it asked for, and accepted, the Association's recommendations for cost-saving measures prior to its final decision made at the March 5, 1990, School Board meeting. A citizens' advisory committee was appointed, and its recommendations were accepted. The District claims it is unquestioned that the Association knew well in advance that the District was going to have to take drastic actions involving the kinds of decisions that were subsequently made. It was fully apparent that such drastic actions would dramatically affect all categories of employees as well as other aspects of the District's educational program. The District also claims it was "equally obvious" that further or more intensive negotiations with the Association would result in "no additional suggestions or proposals by the Association."

■ However, the District points to no evidence in the record to support these statements. There was very little evidence as to what precise proposals the Association put forward for the School Board's consideration. There was no evidence that it was obvious the Association knew precisely what cuts would eventually be made or that it could not have made other proposals had bargaining taken place prior to the RIF decision. There was conflicting evidence as to just how much notice the District gave the Association that it would be making some cuts prior to the March 5, 1990, School Board meeting. In addition, the decision on specific cuts was not final until the School Board voted on them at the March 5, 1990, meeting.

It appears from evidence at the hearing that the Association had only general knowledge that some cuts would have to be made, but that it had no knowledge of specific cuts actually made until the School Board took this action at the March 5, 1990, meeting. Furthermore, the alleged consultation with the Association's executive committee, which the District points to as showing fulfillment of its collective-bargaining duty, does not support its position. The ESPs as to whom the reductions were made had no contract prior to the disputed actions. In its brief, the District seems to equate informing the Association and the general public of its financial problems with negotiating in collective bargaining.

■ The District argues that the fact it was engaged in bargaining over the 1989-90 and 1990-91 collective-bargaining agreements with the Association establishes that the parties were engaging in collective bargaining as to these issues and were negotiating the "final decisions." There is no support in the record for this statement. The evidence was unequivocal that no proposals were made by the District during any of the negotiating sessions concerning any of the RIF decisions at issue here. The District argues that the give-and-take between the Association and the School Board through regular periodic meetings constituted collective bargaining. The District cites this court's decision in *Alton Community Unit School District No. 11 v. Illinois Educational Labor Relations Board* (1991), 209 Ill. App. 3d 16, 567 N.E.2d 671, in support of this contention.

In *Alton*, the parties were involved in negotiation for a collective-bargaining agreement, and disagreement arose over formulation of a teacher evaluation plan. The parties agreed to defer that question in order to reach a collective-bargaining agreement. They agreed to establish a joint committee, with equal representation from both sides, to develop the evaluation plan. After the plan was approved by the State, bargaining was to resume on the aspects of the plan to be included in the contract. After the committee agreed to a plan, the district refused to sign a document containing the plan. The teachers' association filed an unfair labor practice charge, and the IELRB found the district had committed an unfair labor practice by failing to sign a collective-bargaining agreement and failing to bargain in good faith, because it failed to bargain to impasse on the question of whether provisions of the plan were to become subject to the grievance and arbitration provisions of the contract. In the course of its opinion, the court stated the give-and-take between a committee of representatives of the employer and employees which resembles that typical of labor negotiations can, under some circumstances, consti-

tute collective bargaining. *Alton*, 209 Ill. App. 3d at 19-25, 567 N.E.2d at 673-77.

The statement from the *Alton* case, which the District seizes upon to support its conclusion that it did engage in collective bargaining with the Association over the RIF cuts, does not support its position. In the *Alton* case, the joint committee was formed for the specific purpose of negotiating the teacher evaluation plan and its discussion related to that specific topic. In the instant case, the District cannot point to any specific cuts which it put before the Association prior to final action by the School Board. Further, the "give and take" to which the District refers in the instant case also involved the general public attending the School Board meetings. The District has cited no cases to support the argument that third parties who do not have a direct stake in the issues can be included in collective bargaining or that the duty to bargain collectively is fulfilled by discussion at public school board meetings.

Further, the negotiations being conducted on collective-bargaining agreements for the ESPs did not concern the cuts which were finally made. The fact that the District and the Association were engaged in collective bargaining over a new contract for the ESPs did not relieve the District of the duty to bargain over specific contemplated actions if they were mandatory subjects of bargaining.

The District argues that its RIF decisions cannot be interpreted as unilateral reversals of the status quo. In *Vienna School District No. 55 v. Illinois Educational Labor Relations Board* (1987), 162 Ill. App. 3d 503, 506-07, 515 N.E.2d 476, 478-79, this court discussed the question of unilateral changes by an employer in terms and conditions of employment when it observed:

> "In *NLRB v. Katz* (1962), 369 U.S. 736, 8 L. Ed. 2d 230, 82 S. Ct. 1107, the United States Supreme Court established that an employer's unilateral alteration of prevailing terms and conditions of employment under negotiation during the course of bargaining constitutes an unlawful refusal to bargain. [Citation.] 'Unilateral' changes are those alterations implemented without prior negotiation to impasse. [Citation.] Such changes are prohibited so the status quo might be maintained until new terms and conditions of employment are arrived at through bilateral negotiation and by mutual agreement. [Citations.] Unilateral changes are unlawful because they frustrate the 'statutory objective of establishing working conditions through bargaining.' [Citation.]

A term or condition of employment is something provided by an employer which intimately and directly affects the work and welfare of the employees and which has become a mandatory subject of bargaining. [Citation.] Typical terms and conditions include: wages [citation], health insurance, pension contributions [citation], life insurance, medical insurance [citation] and hours [citation]. During collective bargaining, an employer may not take unilateral action on these subjects absent an impasse in negotiations."

■ As stated above, the District did not engage in collective bargaining with the Association on the RIF decisions. There can be little question that with the exception of the termination of health insurance benefits for employees subjected to the RIF, the District's RIF actions altered the status quo at a time when it was engaged in bargaining with the Association on the initial ESP contract. Under the *Vienna* decision, these actions constituted an unlawful refusal to bargain.

■ In addition, the Association's failure to request bargaining over the RIF decisions cannot be held against it. An employee representative must have notice of the proposed action before it can be expected to make a bargaining request. Inadequate notice excuses a failure to make such a request. (See *Forest Preserve District v. Illinois Local Labor Relations Board* (1989), 190 Ill. App. 3d 283, 292, 546 N.E.2d 675, 681, *appeal denied* (1990), 129 Ill. 2d 563, 550 N.E.2d 556.) In the instant case, the weight of the evidence was that the Association had no notice of the specific RIF decisions to be made by the District prior to those decisions being finalized by the School Board's vote at the March 5, 1990, meeting.

C. *Whether the Dismissal of Buckellew and the Other Part-time Custodial Employees and the Conversation with the Association President Constituted an Unfair Labor Practice*

The District maintains that Buckellew and the other part-time custodial employees were at-will employees and their employment could be terminated at any time. It argues there was no basis for bargaining as to these dismissals and that the District did not violate the Act. It cites this court's decision in Buckellew's appeal of the October 1989 reduction in his hours. In *Buckellew*, this court affirmed the circuit court's grant of the District's motion for summary judgment. In that appeal, Buckellew argued that reduction of hours should also be encompassed in section 10—23.5 of the School

Code, which section provides for a 60-day notice to an educational support employee prior to removal or dismissal. The majority in *Buckellew* found that the statute was clear and did not cover reduction of hours. Buckellew was on the list of substitute custodians, he had no contract, he received no employment-related benefits, and he was paid on a different cycle than contract personnel. The court said the relationship between the District and Buckellew was, at best, an implied contract at will, wherein Buckellew served on an "as needed" basis and could stop working for the District at any time. The decision also stressed public policy reasons for not extending the statute beyond its clear meaning. It noted application of the statute to part-time employees would severely limit a District's ability to hire temporary employees for the many seasonal and limited tasks common to a normal school year. *Buckellew*, 215 Ill. App. 3d at 511-13, 575 N.E.2d at 559-60.

The District also cites *Ohlemeier v. Community Consolidated School District No. 90* (1987), 151 Ill. App. 3d 710, 502 N.E.2d 1312, in support of its argument. In *Ohlemeier*, an instructional aide brought suit against a school district because it reduced her hours from six to five hours per day. The basis of her action was breach of contract. At the end of each school year, the aide was given a letter either rehiring her for the following year or giving her reasonable assurance that she would be rehired. The school district's policy manual stated that letters of employment for noncertified personnel could be terminated by either party upon two weeks notice. The *Ohlemeier* court held the aide's contract was subject to the policy manual and the two-week provision. Her contract was therefore an "at-will" contract because it could be terminated by either party upon notice. *Ohlemeier*, 151 Ill. App. 3d at 716, 502 N.E.2d at 1316-17.

■ However, the hearing officer and the IELRB in the instant case did not find the dismissals an unfair labor practice because of the District's failure to bargain with the Association. The District was found to have violated sections 14(a)(1) and (a)(3) of the Act because it dismissed the custodians due to Buckellew's protected activities. *The District stipulated that all the part-time custodians were educational employees under section 2(b) of the Act.* They were members of the bargaining unit represented by the Association. The custodians had been allowed to participate in the Association's representation election in September 1989 without challenge by the District. Therefore, the District has conceded these employees are entitled to protection under the Act. The IELRB found that the key

to an employee's coverage under the Act does not depend on whether he is classified as a "substitute," but rather on whether he has a commitment of continued employment during the school year. The IELRB found that the custodians actually worked on a regular basis. The IELRB, in evaluating the employees' actual responsibilities, held the employees were not short-term employees.

The IELRB found that the Association had demonstrated a "strong" *prima facie* case of discriminatory discharge. A *prima facie* case is established by a showing that (1) the employee was engaged in activity protected under section 14(a)(3) of the Act; (2) the District was aware of that activity; and (3) the employee was discharged for engaging in that activity. Once the complainant has made this showing, the burden shifts to the District to demonstrate by a preponderance of the evidence that the discharge would have occurred notwithstanding (or "but for") the protected activity. This "but for" test, commonly referred to as the *Wright Line* test (derived from *Wright Line, a Division of Wright Line, Inc.* (1980), 251 N.L.R.B. 1083, 105 L.R.R.M. 1169, *enforced* (1st Cir. 1981), 662 F.2d 899, 108 L.R.R.M. 2513, and approved in *NLRB v. Transportation Management Corp.* (1983), 462 U.S. 393, 400-01, 76 L. Ed. 2d 667, 674-75, 103 S. Ct. 2469, 2473-74), has been held by this court to be applicable in discriminatory discharge cases brought under section 14(a)(3) of the Act (Ill. Rev. Stat. 1989, ch. 48, par. 1714(a)(3)). *Hardin County Education Association v. Illinois Educational Labor Relations Board* (1988), 174 Ill. App. 3d 168, 174-78, 528 N.E.2d 737, 740-42.

Buckellew engaged in protected activity by seeking Association assistance in regard to reduction of his hours, and then, with that assistance, by filing the lawsuit. The District, through Behm, was aware of the lawsuit. In fact, Behm admitted he had a copy of the complaint in his hand which had been served on the District at the time he confronted Buckellew. Behm admitted to being very upset with Buckellew and telling him that his lawsuit would probably cause all the custodians to be fired and, if Behm had his way, he would fire Buckellew that day. In his conversation with Association president Howard, Behm became upset with her about Buckellew's lawsuit and the potential cost to the District. He told her he intended to recommend to the School Board that all part-time personnel be dismissed.

In his recommendation to the School Board regarding dismissal of part-time custodians, Behm referred to Buckellew's lawsuit and then stated, "If having part-time employees is going to be this

much hassle, I recommend that you inform the following that their employment will terminate May 25, 1990." He then listed the names of all part-time custodians. On March 5, 1990, the School Board adopted Behm's recommendation without disavowing his rationale for the dismissals. Four days after the effective date of the dismissals, the District rehired six of the nine custodians, although to positions that were not the same or substantially similar to their former positions. In addition, a full-time custodian worked some part-time hours and the District hired a new part-time custodian. The District did not close a building it stated that it intended to close. Buckellew was not offered any position with the District for the 1990-91 school year.

The IELRB found all this evidence clearly established discriminatory discharge. The District tried to show the dismissals were economically motivated. Where a *prima facie* case of discriminatory discharge has been shown and the employer has a reason for dismissal that is not prohibited by the Act, the case is a dual-motive case. In the instant case, the District's actions after the dismissal belie its stated motive. The School Board did not refer to financial reasons when it approved Behm's recommendation to dismiss the custodians. It simply adopted his recommendation without comment. Only at the March 12, 1990, School Board meeting, when the notices of dismissal were approved, was there any mention of finances. The IELRB points out this was only after the District had received a letter from Buckellew's attorney warning against any retaliatory action against Buckellew. The District's actions in rehiring most of the custodians and in hiring a new part-time custodian, as well as not closing one of its buildings, all work against the District on this issue. The IELRB found that the District's stated reason for dismissals was merely a pretext. The IELRB's decision is not against the manifest weight of the evidence.

D. *Whether the Conversation with the*
*Association President Constituted an Unfair*
*Labor Practice*

■ The IELRB found Behm's conversation with Association president Howard to be a violation of section 14(a)(1) of the Act, saying that Behm's remarks to Howard would have had a chilling effect on a reasonable employee. A "reasonable tendency" test is used to determine whether an employer's conduct violates section 14(a)(1) of the Act. Under this test, the conduct is unlawful when it may reasonably be said to have a tendency to interfere with the

free exercise of employee rights under the Act. In evaluating this question, the reasonable construction given to the employer's comments by the listener is critical. *Hardin*, 174 Ill. App. 3d at 188, 528 N.E.2d at 749.

●9 The hearing officer concluded that the clear message to Howard in Behm's remarks was that she and the Association should think twice before taking legal action to enforce the rights of employees represented by the Association. The IELRB, in its brief, says that the only conceivable purpose of complaining to Howard about the Association's assistance to Buckellew was to deter the Association from lending, and employees from seeking, such assistance in the future. The District, in its brief, claims the conversation with Howard was not a violation of the Act, but it does not follow up on that contention with argument or citation of authorities (see 134 Ill. 2d R. 341(e)). Its argument seems to be that this was an isolated incident in an otherwise cooperative relationship between the District and the Association. However, it cites no authority for the proposition that an otherwise good relationship between an employer and a union can excuse an incident of anti-union *animus*. The IELRB's findings on this issue are not against the manifest weight of the evidence, and its opinion and order on this issue shall therefore be affirmed.

## VI. Conclusion

Affirmed in part, and remanded in part to the IELRB for the application of the *Central City* balancing test.

Affirmed in part and remanded in part.

COOK and GREEN, JJ., concur.